Filed 10/5/20  P. v. Parsons CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C090778 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFER20170005938) |
| v. | |
| RONALD PARSONS, | |
| Defendant and Appellant. | |

Defendant Ronald Parsons appeals after a jury found him guilty of evading a police officer, two counts of hit and run causing property damage, obstructing a police officer, and unlawful taking or driving of a vehicle.  On appeal, defendant contends the court's admission of hearsay statements given by a nontestifying witness violated both the state law restrictions on hearsay testimony and his right under both the United States and California Constitution to confront witnesses against him.  (See U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; Evid. Code, §§ 1200, 1240.)  We agree with defendant that the statements were admitted in violation of his right to confront witnesses and reverse.

1

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Pertinent Facts*

On March 7, 2017, Stockton Police Officers Apolonio Garcia-Rangel and Antoinette Laffranchini were on patrol as part of the "Neighborhood Blitz Team." Officer Garcia-Rangel was driving through a parking lot, with Officer Laffranchini in the passenger seat, when he heard tires screeching and noticed a Dodge Charger. Officer Laffranchini ran the Charger's license plate number through the stolen vehicle system, and the system indicated the car had been reported stolen.

The positive hit notified other officers in the area, including Officer Joseph Ciccarelli, who arrived on the scene soon after. As Officer Ciccarelli drove into the parking lot, the Charger passed his patrol car and began accelerating. Officer Garcia-Rangel turned on his car's lights and sirens and followed the Charger. As the Charger quickly turned out of the parking lot, it struck a curb and lost a front tire. The damage caused the Charger to slow and the driver to lose control and collide with a mailbox. It then collided with a fence before striking the garage of a house. Immediately after the Charger hit the house, the driver got out, looked back at the officers, and began running away. Officer Garcia-Rangel chased the driver, repeatedly identifying himself as a Stockton Police Officer and commanding the driver stop. The driver continued running and eventually jumped a fence, escaping Officer Garcia-Rangel.

Officer Garcia-Rangel returned to the patrol car, where he saw Officer Laffranchini detain the passenger of the Charger at gunpoint. Officer Garcia-Rangel placed the passenger in handcuffs and then put him in the backseat of the patrol car. Officer Garcia-Rangel then went to assist other reporting officers as they searched for the driver. Once the officers cleared the backyard of the house, without finding the driver, Officer Garcia-Rangel returned to the patrol car to establish a search perimeter. As he searched a computer in his patrol car for maps of the area, Officer Garcia-Rangel spoke with the passenger who was still handcuffed in the backseat of the patrol car. He asked the passenger "if he knew who the driver was," and the passenger replied the driver was

2

defendant, and identified defendant as his brother. Officer Garcia-Rangel had to ask the passenger three times for the driver's name, as the commotion of other officers searching for the driver distracted Officer Garcia-Rangel from understanding the passenger. The passenger also told Officer Garcia-Rangel defendant's date of birth. Officer Garcia-Rangel used this information to obtain a photograph of defendant and recognized the person in the photograph as the individual who ran away from him. In response to Officer Garcia-Rangel's questions, the passenger gave other physical descriptors, including defendant's build, hair color, and clothing.

As the officers continued their search of the area, a woman driving by pulled over and asked Officers Garcia-Rangel and Laffranchini if her nephew was there. The woman asked the officers the identity of the person in their patrol car, and Officer Garcia-Rangel told her it was the passenger. She did not identify herself to the officers, but at some point yelled "Don't shoot my baby." The woman did not indicate who she was referring to as her "baby." However, evidence admitted at trial revealed she and defendant live at the same apartment.

Officer Garcia-Rangel found a cell phone outside of the Charger at the scene of the crash, which the driver dropped as he ran from Officer Garcia-Rangel. Officer Garcia-Rangel also collected two other cell phones from inside the Charger. Defendant's fingerprints were on one of the phones recovered from the Charger. Medics transported the passenger to a hospital for treatment, but the extent of his injuries, if any, were not testified to at trial.

II

*Relevant Proceedings*

The passenger did not testify at defendant's trial and was not included on the prosecution's proposed witness list. Instead, the prosecution offered Officer Garcia-Rangel to testify to the passenger's statements identifying defendant as the driver. Defendant objected on hearsay and confrontation grounds. The trial court ruled the statements admissible as excited utterances reasoning the passenger "was under the stress of the event and a car chase and crash into a fence and house, that specifically was in

3

response to the police officer's question 'Who was the driver?' There were other cases that discussed that and had indicated that that is a spontaneous declaration . . . . The Court does find in this situation it does meet those requirements. I'll allow [the prosecution] to elicit that testimony, the hearsay statement of [defendant's] brother." The court also overruled defendant's confrontation objection.[1]

During testimony, Officer Garcia-Rangel relayed the passenger's statements identifying and describing defendant as the driver of the Charger. He testified to the importance of this information for providing a description to the other officers responding to the scene to search for the driver. Officer Garcia-Rangel recalled the driver had "short curly hair, almost like an afro-type short hair." The homeowner whose residence was damaged in the collision testified he had never seen defendant before and recalled the driver having dreadlocks.

The parties stipulated to several of the passenger's prior arrests. The court read the following stipulation to the jury: "The district attorney and counsel for [defendant] have reached the following stipulation: [¶] That [the passenger] has the following criminal history: One, arrest for possession of burglary tools in violation of Penal Code Section 466 on May 11th, 2019; [¶] Two, arrest for vehicle burglary in violation of Penal Code Section 459 on April 28, 2018; [¶] Three, arrest for taking or driving a motor vehicle without the owner's consent and receiving a stolen vehicle on October 1st, 2017; [¶] Four, arrested for carrying a concealed firearm upon the person and carrying a loaded firearm on January 16th, 2017. [¶] It is further acknowledged during the April 28, 2018 arrest and the October 1, 2017 arrest, [the passenger] attempted to deflect blame

---

[1]    The timing of the passenger's statements relative to the crash and his detention is unclear. When arguing for the admissibility of the passenger's statements, the prosecution described these statements as being "made within . . . five to ten minutes of the actual accident." At trial, Officer Garcia-Rangel testified that after reviewing his body camera he believed two to three minutes elapsed from noticing the Charger in the parking lot to speaking with the passenger, although looking back he felt as if it was more like five to six minutes.

to other people.  The other coparticipants admitted their actions and partial responsibility."

During closing argument, the prosecution argued that, because the passenger had previously cooperated with police by revealing his criminal associates, the jury should find his statements as relayed by Officer Garcia-Rangel credible.  The prosecution also argued the woman who yelled "Don't shoot my baby" was likely looking for defendant so she could help him evade police.  Finally, the prosecution pointed to the fingerprints recovered from a cell phone in the Charger as evidence linking defendant to the crime.  The prosecution argued the sum total of all of this evidence pointed toward defendant's guilt.  Defendant emphasized the passenger's absence from trial, along with his history of deflecting blame onto other parties, as reasons to doubt defendant's guilt.

The jury returned guilty verdicts on all counts.  Defendant was sentenced to five years of probation.  This appeal followed.

DISCUSSION

Defendant argues the court's admission of the passenger's statements to Officer Garcia-Rangel violated his Sixth Amendment right to confront and cross-examine witnesses against him.  The People argue the court's admission of these statements did not violate defendant's confrontation rights because the statements were not testimonial. We agree with defendant and conclude the error prejudicial.[2]

I

*Relevant Law*

Both the United States and California Constitution provide "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

---

[2]     Because we conclude admission of the passenger's statements violated defendant's right to confront witnesses, we need not decide whether the statements constituted excited utterances under state law.  (See *People v. Liggins* (2020) 53 Cal.App.5th 55, 64 [that the admission of the evidence may comply with state evidentiary law does not end the inquiry, there is a second step to the analysis, one posed by the underlying constitutional objection].)

against him." (U.S. Const., 6th Amend.; see Cal. Const., art. I, § 15.) "[A] primary interest secured by [the confrontation clause] is the right of cross-examination." (*Douglas v. Alabama* (1965) 380 U.S. 415, 418 [13 L.Ed.2d 934, 937].) The opportunity to cross-examine is "the principal means by which the believability of a witness and the truth of his testimony are tested." (*Davis v. Alaska* (1974) 415 U.S. 308, 316 [39 L.Ed.2d 347, 353].) The United States Supreme Court addressed the admissibility of hearsay statements from nontestifying witnesses in *Crawford.* (*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177].) There, the court held "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53-54 [158 L.Ed.2d at p. 194].) Under the facts of that case, the court determined a declarant's statements were testimonial because they were made and recorded while she was in police custody, after having been given *Miranda*[3] warnings as a possible suspect herself. (*Crawford v. Washington*, *supra*, 541 U.S. at pp. 51, 65 [158 L.Ed.2d at pp. 193, 201]; see *Davis v. Washington* (2006) 547 U.S. 813, 822 [165 L.Ed.2d 224, 237].)

While the *Crawford* court declined to offer a comprehensive definition of "testimonial," it reasoned "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." (*Crawford v. Washington*, *supra*, 541 U.S. at p. 52 [158 L.Ed.2d at p. 193].) The court clarified the definition in *Davis*, concluding "[s]tatements are nontestimonial when made in the course of police interrogation[4] under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such

---

**3**     *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

**4**     As used in *Davis¸* "police interrogations" includes all police interactions. (*Davis v. Washington*, *supra*, 547 U.S. at p. 822 [165 L.Ed.2d at p. 237.)

ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington*, *supra*, 547 U.S. at p. 822 [165 L.Ed.2d at p. 237].) "[T]he confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984.)

In *Davis*, the Supreme Court examined two cases to determine whether statements given to law enforcement personnel were testimonial: *State v. Davis* (2005) 154 Wn.2d 291 [111 P.3d 844] and *Hammon v. State* (Ind. 2005) 829 N.E.2d 444. (*Davis v. Washington*, *supra*, 547 U.S. at p. 813 [165 L.Ed.2d at p. 224].) In the first of these cases, *Davis*, the victim gave the relevant statements during a 911 call. (*Id.* at pp. 817-818 [165 L.Ed.2d at p. 234].) The court acknowledged the 911 call was a police interrogation, but distinguished it from *Crawford*, stating the holding in *Crawford* was concerned with "interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial." (*Davis*, at p. 826 [165 L.Ed.2d at pp. 239-240].) In *Davis*, however, the victim "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events.' " (*Id.* at p. 827 [165 L.Ed.2d at p. 240]; quoting *Lilly v. Virginia* (1999) 527 U.S. 116, 137 [144 L.Ed.2d 117, 135].) The court reasoned the victim in *Davis* was facing an ongoing emergency, as her 911 call was "plainly a call for help against a bona fide physical threat." (*Davis*, at p. 827 [165 L.Ed.2d at p. 240].) Further, the court concluded the 911 operator's questions were of such a nature as to elicit statements "necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." (*Davis*, at p. 827 [165 L.Ed.2d at p. 240].) For these reasons, the court concluded the victim's statements were not testimonial. (*Id.* at p. 829 [165 L.Ed.2d at p. 241].)

In *Hammon*, the companion case to *Davis*, the court determined a victim's statements to officers who reported to her home for a domestic disturbance were

testimonial and thus should have been excluded. (*Davis v. Washington*, *supra*, 547 U.S. at pp. 819, 834 [165 L.Ed.2d at pp. 235, 244].) The court concluded the officer's interrogation of the victim was sufficiently formal, as it was "conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].' " (*Davis*, at p. 830 [165 L.Ed.2d at p. 242].) Further, "[i]t [wa]s entirely clear from the circumstances that the interrogation was part of an investigation into possible criminal past conduct . . . . There was no emergency in progress." (*Id.* at p. 829 [165 L.Ed.2d at p. 242].) The court further distinguished *Hammon* from *Davis*, reasoning the victim in *Davis* was "seeking aid, not telling a story about the past. [Her] present-tense statements showed immediacy." (*Davis*, at p. 831 [165 L.Ed.2d at p. 243].) Meanwhile, the victim's statements in *Hammon* narrated past events and were "delivered at some remove in time from the danger she described," as evidenced by her signing an affidavit. (*Davis*, at p. 832 [165 L.Ed.2d at p. 243].) The court therefore reversed the petitioner's conviction in *Hammon*, concluding "the Sixth Amendment operates to exclude [the victim's] affidavit." (*Davis*, at p. 834 [165 L.Ed.2d at p. 244].)

## II

### *The Passenger's Statements Were Testimonial*

The passenger gave his statements to Officer Garcia-Rangel after he had been detained at gunpoint, handcuffed, and placed in the back of a patrol car. This constituted a custodial interrogation despite the People's argument to the contrary. (See *Miranda v. Arizona*, *supra*, 384 U.S. at p. 444 [16 L.Ed.2d at p. 706] [a custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"].) More importantly, however, the passenger's statements were the product of an interrogation "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator." (*Davis v. Washington*, *supra*, 547 U.S. at p. 826 [165 L.Ed.2d at p. 240].)

8

Like the officer in *Hammon*, Officer Garcia-Rangel "was not seeking to determine . . . 'what is happening,' but rather 'what happened.' " (See *Davis v. Washington*, *supra*, 547 U.S. at pp. 829-830 [165 L.Ed.2d at pp. 241-242].) Indeed, Officer Garcia-Rangel witnessed the crime occur, including who the driver of the Charger was, and knew what was happening -- the driver of the car was fleeing through the neighborhood. Once Officer Garcia-Rangel's pursuit of the driver ended and he began questioning the passenger about who the driver was, Officer Garcia-Rangel's focus was directed at establishing facts to "identify (or provide evidence to convict) the perpetrator." (See *id* at p. 826 [165 L.Ed.2d at p. 240].)

The People disagree relying on *Romero*, *Pedroza*, and *Brenn*. (*People v. Romero* (2008) 44 Cal.4th 386; *People v. Pedroza* (2007) 147 Cal.App.4th 784; *People v. Brenn* (2007) 152 Cal.App.4th 166.) The People argue Officer Garcia-Rangel's primary purpose in questioning the passenger was to respond to the ongoing emergency of an escaped suspect whose "dangerousness was unknown." In each of the cases cited by the People, however, the officer did not question a suspected coparticipant during a custodial interrogation or witness the criminal event -- two meaningful distinctions.

First, the questioning of a coparticipant during a custodial interrogation carries with it signs of a formal interrogation designed to gather evidence. (See *Crawford v. Washington*, *supra*, 541 U.S. at pp. 51-52 [158 L.Ed.2d at p. 193].)

Further, unlike the officers in *Pedroza* and *Brenn*, Officer Garcia-Rangel was not reliant on the passenger's statements to fill gaps of what happened prior to his arrival, including whether a crime occurred or who the perpetrator was. (See *People v. Pedroza*, *supra*, 147 Cal.App.4th at p. 793 [statements were nontestimonial when officers responded to an ongoing emergency of a house actively burning and they needed to ascertain whether the fire was the result of an accident or a crime and whether there was a potentially dangerous suspect]; see also *People v. Brenn*, *supra*, 152 Cal.App.4th at pp. 170, 172, 177-178 [answers to officer's preliminary questions determining whether a crime was committed, whether the victim was in need of medical attention, and whether the person detained was the person who committed the crime were nontestimonial].)

Officer Garcia-Rangel further did not have to rely on the passenger's identification of the driver because, if apprehended, Officer Garcia-Rangel could identify the driver himself. This serves in stark contrast to *Romero* where "[t]he primary purpose of the police in asking [the victim] to identify whether the detained individuals were the perpetrators, an identification made within five minutes of the arrival of the police, was to determine whether the perpetrators had been apprehended and the emergency situation had ended or whether the perpetrators were still at large so as to pose an immediate threat." (*People v. Romero*, *supra*, 44 Cal.4th at p. 422.)

We also disagree with the People that Officer Garcia-Rangel's questioning was for the primary purpose of assessing the driver's dangerousness. Officer Garcia-Rangel asked the passenger for the driver's name and other identifying characteristics. These questions were not designed to determine whether the driver posed a danger to the officers looking for him or whether the driver was armed. Officer Garcia-Rangel's questions were for the purpose of putting a name to the face he saw flee the stolen car. This is supported by Officer Garcia-Rangel's conduct of checking the name given by the passenger in a database containing photographs that confirmed Officer Garcia-Rangel's identification. There is no indication Officer Garcia-Rangel questioned the passenger for any reason other than to identify the person Officer Garcia-Rangel saw drive the Charger and flee from the scene of a crash. Because this line of questioning seeks to determine what happened and to identify a perpetrator for purposes of prosecution, the passenger's answers to Officer Garcia-Rangel's questions were testimonial and should have been excluded.

## III

### *The Error Was Not Harmless*

Defendant contends the admission of the passenger's statements was prejudicial because the People cannot prove the evidence was unimportant to the jury's verdicts. He argues the prosecution's heavy reliance on the passenger's identification of defendant as the driver is proof the evidence was prejudicial. The People make no argument on this point. We agree with defendant.

10

If the reviewing court finds a defendant's confrontation rights were violated, it must determine whether the violation prejudiced defendant under *Chapman*. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159, citing *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].) The *Chapman* court stated "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman*, at p. 24 [17 L.Ed.2d at pp. 710-711].) Under this standard, "[t]o say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates v. Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 449].) "[T]he question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered -- no matter how inescapable the findings to support that verdict might be -- would violate the jury-trial guarantee." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [124 L.Ed.2d 182, 189].)

The identity of the driver was the key issue presented to the jury. Moreover, identity was highly contested. Officer Garcia-Rangel described the driver as having "short curly hair, almost like an afro-type short hair." He stated he saw the driver's face once or twice as he ran away. Officer Garcia-Rangel further stated he recognized the driver as the man in the search result of defendant's name. The homeowner whose residence was damaged in the crash also testified for the prosecution. When asked by the prosecution, the homeowner denied ever seeing defendant in his neighborhood. He further stated that although the defendant was "about the height" of the driver he briefly saw running away, the driver "had longer hair," such as dreadlocks, and repeated he had never seen defendant before.

11

To resolve this conflicting testimony, the prosecution substantially relied on the passenger's statement identifying defendant. In the prosecution's closing argument, it repeatedly emphasized reasons the jury should find the passenger's statement credible, arguing the passenger's history of telling police about other individuals involved in criminal activity and the fact defendant was his brother contributed to his overall credibility. The prosecution's heavy reliance on the passenger's statement in its argument demonstrated the importance of this evidence to its case. (See *People v. Earle* (2009) 172 Cal.App.4th 372, 409 ["nothing could more vividly demonstrate the crucial role played by the [evidence] in securing the . . . conviction than the prosecutor's own heavy and pervasive reliance on it in jury argument"].)

Without the passenger's statements, the only evidence tending to resolve the conflicting testimony regarding defendant's identity were statements made by a woman driving past the accident and defendant's fingerprints on a cell phone recovered from the stolen car. As for the woman, she drove by the scene several times and at some point yelled "Don't shoot my baby!" The prosecution used this statement, along with the evidence she and defendant lived at the same address, to suggest the woman may have been looking for defendant. There was, however, no evidence proving this woman was looking for defendant rather than the passenger, who is defendant's brother. Therefore, this circumstantial evidence provides little corroborating weight to Officer Garcia-Rangel's identification.

The prosecution also relied on forensic evidence showing defendant's fingerprints were on one of two cell phones collected from the Charger. We can infer from defendant's fingerprints only that he at some point touched a cell phone recovered from the car, not that he touched the cell phone while driving the car. (See *People v. Jenkins* (1979) 91 Cal.App.3d 579, 584 ["The only fact directly inferable from the presence of the fingerprints is that sometime, somewhere defendant touched the [cell phone]"]; *People v. Flores* (1943) 58 Cal.App.2d 764, 769 [concluding fingerprint evidence matching defendant obtained from a stolen vehicle did not establish beyond a reasonable doubt defendant was the thief].) Considering the cell phone was recovered in defendant's

12

brother's presence, the circumstantial evidence of defendant's fingerprints is susceptible to other interpretations not necessarily pointing to guilt. For example, defendant could have handed his brother a cell phone before his brother left the house and became the passenger in this stolen Charger. Because the fingerprint evidence provided weak support of Officer Garcia-Rangel's identification, we cannot point to it as sufficient support of the verdicts absent consideration of the passenger's statements.

The passenger's statements were the prosecution's best and clearest evidence corroborating Officer Garcia-Rangel's contested identification of defendant as the driver of the Charger. Without the passenger's improperly admitted hearsay statements, the jury would have been left only with circumstantial evidence susceptible to various interpretations. Accordingly, we cannot say the statements erroneously admitted in violation of defendant's confrontation rights were unimportant to the jury's ultimate conclusion. (See *Yates v. Evatt*, *supra*, 500 U.S. at p. 403 [114 L.Ed.2d at p. 449].) Thus, we must reverse.

## DISPOSITION

The judgment is reversed.

/s/
Robie, Acting P. J.

We concur:

/s/
Mauro, J.

/s/
Hoch, J.

13