Filed 1/18/23  P. v. Ambrocio-Garcia CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HECTOR AMBROCIO-GARCIA,<br><br>    Defendant and Appellant. | A163906<br><br>(Solano County<br>Super. Ct. No. FCR343767)<br><br>**[REDACTED]** |

The prosecutor charged defendant Hector Ambrocio-Garcia with sexually abusing three young girls.  The jury acquitted him of the sexual abuse charges, but it convicted him of misdemeanor battery, assault, and indecent exposure; the trial court imposed jail time and barred him from contacting the victims for 10 years.  Defendant appeals, raising numerous claims of error.  His principal contention is the admission of a witness's conditional examination testimony violated the confrontation clause of the federal Constitution because the prosecutor did not make a good-faith, reasonable effort to secure the witness's presence at trial.  We agree, and we find the error prejudicial.  We reverse count 1 — the battery conviction as to that witness.  In all other respects we affirm.

## BACKGROUND

The prosecutor charged defendant with sexual penetration of Y.L., a child under 10 years old (Pen. Code, § 288.7, subd. (b), counts 1 and 2);[1] committing a forcible lewd act upon N.R.-L., a child under 14 years old (§ 288, subd. (b)(1), count 3); committing lewd acts upon R.V.-G., a child under 14 years old (§ 288, subd. (a), counts 4 and 5); and misdemeanor indecent exposure (§ 314, count 6).

In 2018, Yesenia G.-L. left Central America and entered the United States illegally. Her six-year-old daughter, R., and her 10-year-old son, L., accompanied her. At an immigration appointment, Yesenia met a woman who lived in defendant's apartment building. Yesenia needed a place to live, so the neighbor gave her defendant's contact information. Thereafter, Yesenia rented a room in his two-bedroom apartment. She, her two children, and her brother-in-law lived in one bedroom. Defendant and his two young children lived in the other bedroom. Later, two other families moved into the living room — six-year-old Y. and her father, and seven-year-old N. and her father.

At trial, the prosecutor introduced testimony from several children who lived in defendant's apartment. For example, Y. testified defendant hugged her and touched her genital area once, over her clothes, while N. was present.[2] It made Y. feel badly, but she did not tell her father — who was in

---

[1] Undesignated statutory references are to this code. We provide an overview of the trial testimony here, and more detail in the discussion of defendant's specific claims.

[2] Y. — who was "out of the country" — did not testify at trial. In lieu of her testimony, the prosecution played her videotaped conditional examination for the jury. Y. identified defendant based on a picture; she did not see him in the courtroom.

another room — because he "knew about it already." Once, she saw defendant touch N. in the same place he touched her. Y. also witnessed him showing his genital area to N., but she did not talk with her about it.

**[REDACTED]**[3]  **[REDACTED]**

N. testified that late one evening — while everyone "was sleeping" — she got up to use the bathroom. Defendant was standing next to the bathroom. Before she entered the bathroom, he covered N.'s mouth, touched her "private part" over her underwear, and threatened to "do it again" if she told her father. N. did not tell her father what happened because she was afraid defendant "would do that to [her] again." She did not talk with Yesenia — or with the other children who lived at the apartment — about the incident. In a forensic interview, N. said **[REDACTED]**.

R. testified defendant exposed his genitals to her more than once. On one occasion, her mother, Yesenia, witnessed it and asked her about it, but R. did not want to talk about it — she was scared "something bad might be done" to her. Defendant also made R. touch his penis and threatened to "do things" to her if she told her mother. She told N. — but not her mother — what happened. In a forensic interview, R. said **[REDACTED]**.

L. testified about an incident when he and his sister, R., saw defendant come out of the bathroom wearing a towel. Defendant opened the towel, revealing his boxers.[4] When L.'s mother, Yesenia, found out, she "got into

---

[3] The prosecution played video recordings of the children's February 2019 forensic interviews for the jury, and the trial court admitted interview transcripts as exhibits. The interviews were conducted in Spanish; the transcripts were translated into English. Psychologist Anthony Urquiza, Ph.D., testified regarding child sexual abuse accommodation syndrome (CSAAS), an educational tool used to dispel misconceptions about how children respond to sexual abuse.

[4] L. was unable to identify defendant at trial.

a fight" with defendant.  Shortly thereafter, N. told Yesenia about her experience with defendant.  Yesenia, in turn, spoke with N.'s father, and he and defendant fought.  During a forensic interview, L. said **[REDACTED]**.

Yesenia testified defendant exposed himself to her daughter, R. Yesenia explained that she saw defendant looking at her daughter "in a different way."  Then her daughter went into her bedroom and defendant went into his — the bedrooms faced each other.  As Yesenia crept toward the bedrooms, she saw defendant standing near his doorway.  The door was open, and he was playing with his penis while R. watched from her bedroom.  When he saw Yesenia, he pretended like he was going to bed.  She planned to confront him, but her brother-in-law persuaded her not to.  Instead, she and her daughter left the apartment.  Although her daughter did not want to discuss it, she confirmed what happened.  Several months later, Yesenia told R.'s school about the incident, and she asked for help from the immigration agency.  But she received no assistance.  Eventually, Yesenia called the police.  After reporting defendant, Yesenia obtained a lawyer and applied for asylum.

On cross-examination, Yesenia acknowledged coming to the United States illegally, but she denied wanting to obtain a visa based on her daughter's status as a crime victim.  She also disclaimed being at risk of deportation or removal from the United States while living in defendant's apartment.  Additionally, Yesenia denied both falsely accusing a man in Central America of sexually assaulting a minor and telling defendant's neighbor about it.

The defense offered evidence defendant behaved appropriately with children.  Martha D., the mother of one of defendant's children, drove Yesenia to several immigration appointments.  During those trips, Yesenia said

4

defendant showed "his part to the girl as he was going to the . . . bedroom," yet she continued spending time with him. According to Martha, defendant acted appropriately when children — including her daughter from another relationship — were in his care. Another woman, Marisol M., with whom defendant had a child, lived with defendant for seven years. Marisol's children from another relationship, including her six-year-old daughter, also lived with defendant. He comported himself appropriately around her children, and he never came out of the bathroom wearing only a towel. Defendant's brother testified he behaved respectfully toward his five nieces.

The defense also offered evidence Yesenia had a motive to fabricate the allegations to obtain asylum. She divulged to defendant's neighbor that she and another person falsely accused a man of raping an underage girl in Central America, and she fled the country because the man wanted to kill her. In 2019, Yesenia told the neighbor she was going to be deported, and said she was applying for a U-visa based on the allegations against defendant. According to another defense witness, Yesenia admitted she would do "everything . . . to remain in this country."

Psychologist William O'Donohue testified for the defense as an expert on child sexual abuse, interviewing alleged child abuse victims, and CSAAS. He testified perpetrators "usually isolate" their victims during — and after — the abuse, so a report that other adults were present during the abuse would be "unusual." Because victims of sexual abuse have "vivid memories" of the abuse, it is "unusual" when a child can provide "very few details," though the younger the child, the fewer details the child can provide. It is "very rare" for "children who have actually been sexually abused" to provide inconsistent "central details" about the abuse. Children are highly suggestible, and asking them leading questions is a "potent" way to create false memories

5

about an incident.  Parents can also influence a child's answers by implying there is an incentive for answering a question in a particular way.  Over defense counsel's objection, Dr. O'Donohue testified his research found most child sexual abuse allegations are true.

After deliberating for approximately two days, the jury acquitted defendant of counts 1 through 5, but it convicted him of two counts of battery (lesser included offenses of counts 1 and 4), assault (a lesser included offense of count 3), and indecent exposure (count 6).  The trial court sentenced defendant to time served, ordered him to register as a sex offender, and issued criminal protective orders prohibiting him from contacting Y., N., and R. for 10 years.

## DISCUSSION

Defendant challenges the convictions on several grounds.  We address each argument in turn.

### I.

Defendant first argues the admission of Y.'s conditional examination violated his federal constitutional rights to confront and cross-examine witnesses.  He contends the conditional examination was inadmissible because the prosecutor failed to establish it exercised due diligence in securing Y.'s presence at trial, and that the error was prejudicial under *Chapman v. California* (1967) 386 U.S. 18, 24.  We agree.

As background, the prosecutor moved to conditionally examine Y.  (See § 1335 et seq.)[5]  According to the motion — and a declaration submitted on

---

[5] Sections 1335 through 1345 govern conditional examinations.  In noncapital cases, the prosecution may move for an order " 'compelling a material witness to submit to a conditional examination if the witness "*is about to leave the state . . . .*" ' " (*People v. Foy* (2016) 245 Cal.App.4th 328, 341–342 (*Foy*); § 1337, subd. (d)(1).)  At the conditional examination, the

information and belief — Y.'s father had been deported, she was in foster care, and the dependency court had determined she would be returned to her mother's care in Guatemala. The prosecutor argued a conditional examination was necessary because Y. — a material witness on counts 1 and 2 "and the only percipient witness to those incidents" — was scheduled to leave the state.

Defense counsel asserted a confrontation clause objection, arguing a conditional examination would be tantamount to "trial by video." Counsel reasoned it would be difficult to assess Y.'s demeanor, her competency to testify, and her credibility on video; these issues, counsel explained, were paramount as the prosecutor's case depended entirely on witness credibility. In response, the prosecutor insisted a conditional examination was necessary as she had "no basis to believe" Y.'s parents planned to return to the United States or that they would be able to do so. And the prosecutor noted the admissibility of the conditional examination — including the prosecutor's diligence in securing Y.'s presence at trial — was an issue for another day. The trial court agreed; it allowed the conditional examination to proceed, observing defendant could litigate its admissibility before trial.

Thereafter, Y. — seven years old at the time — was sworn and testified at a videotaped conditional examination. Defendant attended the conditional examination, and his counsel cross-examined Y. Before trial, the prosecutor moved to admit the conditional examination in lieu of live testimony pursuant to section 1345, arguing Y. was unavailable within the meaning of Evidence Code section 240 because she had returned to Guatemala, and

---

defendant has the right to be present with counsel (§ 1340, subd. (a)). The witness testimony must "be reduced to writing and authenticated in the same manner as the testimony of a witness taken in support of an information," and "may be video-recorded." (§ 1343.)

neither she (nor her mother) had "plans to return to the United States in the near future, if ever." Relying on authorities including Evidence Code section 240, subdivision (a)(4), the prosecutor posited she need not show diligence in securing Y's presence at trial. The trial court asked the prosecutor, whether Y., "as far as we know, is now out of the country," and whether she had "[n]o plans to return in the near future." The prosecutor responded, "Yes." Defense counsel objected. She maintained the admission of the evidence violated the confrontation clause of the federal Constitution. The court granted the motion to admit the conditional examination. It stated, barring "evidence that [Y.] is now available and can be subpoenaed," the videotape of her conditional examination would be played for the jury.

We begin by summarizing the relevant constitutional principles. The state and federal Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (*People v. Herrera* (2010) 49 Cal.4th 613, 620 (*Herrera*).) "The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' " ' " (*Id.* at pp. 620–621.) Denying or significantly diminishing " 'this right deprives a defendant of the essential means of testing the credibility of the prosecution's witnesses, thus calling "into question the ultimate ' "integrity of the fact-finding process." ' " ' " (*Id.* at p. 621.)

The right of confrontation, however, is not absolute — an exception exists " 'when a witness is unavailable and, at a previous court proceeding

8

against the same defendant, has given testimony that was subject to cross-examination.' " (*Foy*, *supra*, 245 Cal.App.4th at p. 338.) This exception is codified in section 1345, which provides that a video-recorded conditional examination may be shown at "trial if the court finds that the witness is unavailable as a witness within the meaning" of Evidence Code section 240. As relevant here, there are two closely related — but slightly different — ways in which a witness may be deemed unavailable under Evidence Code section 240. (*People v. Smith* (2003) 30 Cal.4th 581, 610 (*Smith*).) Under subdivision (a)(4), a witness is unavailable when she is absent and the trial court is unable to compel her attendance by its process. (Evid. Code, § 240, subd. (a)(4).) Under subdivision (a)(5), a witness is unavailable when she is absent and the proponent of the evidence "has exercised reasonable diligence but has been unable to procure . . . her attendance by the court's process." (*Id.*, subd. (a)(5).)

Although Evidence Code section 240, subdivision (a)(4) does not contain a " 'reasonable diligence' requirement, . . . unavailability in the constitutional sense nonetheless requires a determination that the prosecution satisfied its obligation of good faith in attempting to obtain [the witness's] presence." (*Herrera*, *supra*, 49 Cal.4th at pp. 622–623.) In this respect, the "constitutional and statutory requirements are 'in harmony.' " (*Smith*, *supra*, 30 Cal.4th at p. 609; *People v. Valencia* (2008) 43 Cal.4th 268, 291–292.) The proponent of the evidence has the burden of showing — by competent evidence — the witness is unavailable (*Foy*, *supra*, 245 Cal.App.4th at p. 339) and "that it made a 'good-faith effort' . . . or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial." (*People v. Sánchez* (2016) 63 Cal.4th 411, 440; *Herrera*, at p. 623.)

9

Reasonable diligence — also called due diligence — has been described as " ' "untiring efforts in good earnest, efforts of a substantial character." ' " (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.)  Considerations relevant to this inquiry " 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*Herrera, supra*, 49 Cal.4th at p. 622.)  In " 'cases in which courts have not found adequate diligence, the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent [Citations.] . . .  On the other hand, diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period.' " (*People v. Torres* (2020) 48 Cal.App.5th 731, 748.)  "On review we defer to the trial court's factual findings that are supported by substantial evidence, but we 'independently review whether the facts demonstrate prosecutorial good faith and due diligence.' " (*Foy, supra*, 245 Cal.App.4th at p. 339.)

*People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*) is instructive.  There, Elias Zavala — a witness to his brother's murder — testified at a preliminary hearing but was deported to Mexico before trial. (*Id.* at pp. 1428, 1432.)  The prosecution offered evidence he was "willing to testify if he could get a passport and visa to enter the United States legally," but he needed money to travel to Mexico City to apply for a passport and visa, and to make the trip to California.  The prosecution, however, elected not to help Zavala make the trip to Mexico City, "and apparently did nothing more to secure his attendance at the trial." (*Id.* at p. 1432.)  The trial court impliedly concluded Zavala was unavailable and admitted his preliminary hearing testimony; a jury convicted defendants of murder and other crimes. (*Id.* at pp. 1428, 1432–1433.)

10

*Sandoval* reversed, holding the prosecution failed to show it made a reasonable, good-faith effort to obtain Zavala's attendance at trial. (*Sandoval*, *supra*, 87 Cal.App.4th at p. 1428.) The court acknowledged Zavala was absent, and the trial court had no power to compel his appearance. But it declined to conclude the prosecution had no obligation to make a good-faith effort to obtain his attendance at trial "simply because the court could not compel his presence" under a mutual legal assistance treaty between Mexico and the United States. (*Id.* at p. 1440.) As *Sandoval* reasoned, the court's power to compel a witness's attendance is not "the sine qua non of the requirement to make a good faith effort to obtain the attendance of a witness. Instead, power to compel is merely one factor to consider in determining whether such effort would be futile and therefore need not be undertaken." (*Id.* at pp. 1440–1441.) *Sandoval* held there "was a possibility, not remote, even perhaps a likelihood, that Zavala would attend if the prosecution assisted him" even "without reference or resort to the Treaty." (*Id.* at pp. 1441–1442.) The court continued, "[c]onsideration of the options available to the prosecution and the extent to which the prosecution attempted to use these alternatives to obtain Zavala's presence establishes that the prosecution did not make a reasonable, good-faith effort." (*Id.* at p. 1444; compare *People v. Martinez* (2007) 154 Cal.App.4th 314, 329 [upon learning the witness was in Canada, the prosecution contacted various governmental entities, including "immigration authorities in Canada," and spoke to the witness and offered to pay his travel expenses].)

We now turn to the parties' arguments. The Attorney General argues defendant forfeited his challenge to the admission of Y.'s conditional examination by neglecting to "specifically object" to the prosecutor's failure to use reasonable diligence to secure Y.'s presence at trial. This contention is

11

meritless. Defense counsel objected — twice — on Sixth Amendment confrontation grounds. It is well settled a witness is not constitutionally unavailable for purposes of an exception to the confrontation requirement unless the prosecution has made a good-faith effort to obtain the witness's presence at trial. (*Crawford v. Washington* (2004) 541 U.S. 36, 53–54; *Foy, supra,* 245 Cal.App.4th at p. 345.) Thus, counsel's objection was sufficient to alert the trial court to the grounds for exclusion. (See *People v. Holt* (1997) 15 Cal.4th 619, 666–667; *People v. Sánchez, supra,* 63 Cal.4th at p. 442.) Additionally, because the prosecutor argued it was "unnecessary to make a showing of good faith effort" — and the trial court agreed — any "argument to the contrary would have been futile." (*Sandoval, supra,* 87 Cal.App.4th at p. 1433, fn. 1 [failure to raise due diligence argument "was not a waiver of the issue"].) But assuming for the sake of argument the claim is forfeited, we exercise our discretion to reach the merits. (See *People v. Tate* (2010) 49 Cal.4th 635, 677, fn. 23; *People v. Dunley* (2016) 247 Cal.App.4th 1438, 1447.)

The Attorney General next contends the prosecutor established Y. was unavailable by offering "uncontradicted evidence" she was "in Guatemala at the time of trial without plans to return to the United States."[6] Not so. There was no *evidence* before the trial court that Y. wasn't planning to return to California for trial. There was only the prosecutor's conclusory representation — made before the conditional examination — that she had "no basis to believe" Y.'s parents planned to return to the United States, and

---

[6] The Attorney General also asserts the conditional examination was admissible under state law without a showing of due diligence. We need not decide this issue as defendant contends the admission of the evidence violated the confrontation clause of the federal Constitution. (*Foy, supra,* 245 Cal.App.4th at p. 344.)

her unsubstantiated claim — made on the eve of trial — that, "as far as we know," Y. had no plans to return to California. "[U]nsworn statements of counsel are not evidence." (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11.) Also absent from the record is evidence the prosecutor made *any* effort to procure Y.'s attendance at trial, such as impressing upon Y.'s mother that her daughter was a material witness and seeking her assurance she and Y. would voluntarily return to California, or by providing Y.'s mother with information and resources to facilitate Y.'s reentry to testify. (See *People v. Roldan* (2012) 205 Cal.App.4th 969, 984; *Sandoval, supra,* 87 Cal.App.4th at p. 1442.)

Moreover, the Attorney General concedes the prosecutor offered no information as to the existence — or absence — of "agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government. [Citation.] Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so is relevant in determining whether the obligations to act in good faith and with due diligence have been met." (*Herrera, supra,* 49 Cal.4th at p. 628, 617 [prosecution provided evidence "El Salvador and the United States had no treaty providing for [the witness's] extradition to this country to testify"]; *People v. Torres, supra,* 48 Cal.App.5th at p. 736 [prosecutor alerted court to the absence of a bilateral treaty or mutual agreement].)

The Attorney General seems to invite us to conclude the prosecutor did everything she could to secure Y.'s presence at trial based solely on an unsworn and unsubstantiated representation that Y. had no plans to return to the United States. "We believe the Sixth Amendment demands a more particularized showing of due diligence . . . . After all, as we have noted, the prosecution has the burden of proof when it comes to establishing the

13

unavailability of its witnesses." (*People v. Roldan, supra*, 205 Cal.App.4th at p. 984; *People v. Louis* (1986) 42 Cal.3d 969, 992 ["failure to take such minimal action plainly conflicts with the claim that the prosecution exercised due diligence"].)

The Attorney General's reliance on *Smith, supra*, 30 Cal.4th 581 is unavailing. In *Smith*, the trial court admitted the preliminary hearing testimony of a foreign exchange student who returned to Japan before trial. (*Id.* at pp. 608–609.) The California Supreme Court affirmed, holding the prosecution satisfied its burden of showing due diligence by offering evidence an investigator in the district attorney's office called the witness's telephone number in Japan, asked to speak to the witness, and a "male voice answered, 'Yes, this is me.' " (*Id.* at pp. 608, 611.) On questioning by the court, the investigator testified he believed he could not compel the witness's presence "because he was in Japan." (*Id.* at p. 609.) This information, *Smith* determined, "sufficed to show that the prosecution made reasonable efforts to locate [the witness] and that further efforts to procure his attendance would be futile." (*Id.* at p. 611.) *Smith* is distinguishable. Here — and in contrast to *Smith* — the prosecutor offered no evidence of its efforts to locate Y. or to procure her attendance at trial. Additionally, in *Smith*, the defendant did not argue "the prosecution was required to do more to procure his attendance, such as request that he come voluntarily to testify" (*id.* at p. 611, fn. 6), but that argument is before us here.

Also distinguishable is *Herrera, supra*, 49 Cal.4th 613, where the defendant, a gang member, was charged with murder and gang-related enhancements. At a preliminary hearing, a prosecution witness (and former gang member) testified the defendant confessed to the murder. The witness, however, was deported to El Salvador before trial. (*Id.* at pp. 617–618.) In

connection with its motion to admit the witness's preliminary hearing testimony, the prosecution offered evidence it unsuccessfully attempted to locate the witness in El Salvador, and that even if the witness "could be located in El Salvador, that country had no treaty with the United States and would not extradite him." (*Id.* at pp. 620, 628–629.)

The California Supreme Court upheld the admission of the witness's preliminary hearing testimony, concluding ample evidence demonstrated the witness was in El Salvador at the time of trial, "and therefore beyond the court's own process." (*Herrera, supra*, 49 Cal.4th at p. 629.) As *Herrera* observed, it was undisputed the prosecution's efforts to locate the witness "proved unsuccessful," and that had the witness been found, there was no "agreement or treaty providing for an alternative means to compel or facilitate his attendance" at trial. (*Ibid.*) *Herrera* concluded "the prosecution fulfilled its obligation of good faith and due diligence under the circumstances, that [the witness] was unavailable . . . , and that therefore admission of his preliminary hearing testimony at trial was proper." (*Ibid.*) Unlike *Herrera*, the prosecutor here made no documented effort to locate Y. in Guatemala, and the record is devoid of evidence regarding the prosecutor's ability to compel Y.'s presence or facilitate her attendance at trial.

Applying our independent judgment, we conclude the prosecutor did not satisfy her burden of showing due diligence in securing Y.'s presence at trial. (*Sandoval, supra*, 87 Cal.App.4th at p. 1444.) In reaching this conclusion, we do not hold the prosecutor must, in every case, attempt to secure a witness's voluntary return from a foreign country. We are mindful the law neither requires futile acts (*Herrera, supra*, 49 Cal.4th at p. 622) nor demands " 'prescient perfection' " in securing a witness's testimony. (*People*

15

*v. Diaz* (2002) 95 Cal.App.4th 695, 706 [appellate court will not reverse due diligence finding merely " 'because the defendant can conceive of some further step or avenue left unexplored by the prosecution' "].) But if there is a possibility — even a remote one — that prosecutorial actions might produce the witness, "the obligation of good faith *may* demand their effectuation." (*Herrera*, at p. 622.) And appellate review would benefit from prosecutors making a record of what efforts were undertaken to secure the witness's presence. On this record, we cannot conclude the prosecutor satisfied her burden of showing due diligence. (*Sandoval*, at p. 1442.)

Thus, the trial court's admission of Y.'s conditional examination testimony violated defendant's Sixth Amendment confrontation rights. (*Foy*, *supra*, 245 Cal.App.4th at p. 350.) We now consider whether the error is prejudicial as to count 1, the conviction for battering Y. The parties agree reversal is required unless the record shows beyond a reasonable doubt defendant was not prejudiced. (*Chapman v. California*, *supra*, 386 U.S. at pp. 23–24; *Foy*, at p. 350.) "To determine whether a confrontation clause violation is harmless beyond a reasonable doubt, courts consider 'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " (*Foy*, at p. 351.)

The Attorney General concedes a violation of the confrontation clause mandates reversal. We accept the concession. Y.'s conditional examination was crucial to count 1, as she was the victim and primary witness, and the

16

Attorney General does not point to other evidence supporting the conviction.[7] That the conditional examination was videotaped — which permitted the jury to evaluate Y.'s demeanor and assess her credibility — does not, by itself, eliminate the harm in admitting the evidence. (*Foy*, *supra*, 245 Cal.App.4th at pp. 351–352.) Finally, defendant offered a plausible defense to the sexual abuse charges — that he behaved appropriately around children, and Yesenia had a motive to orchestrate the allegations to obtain asylum. (*Id.* at p. 351.)

But we disagree with defendant's cursory contention the error was prejudicial as to the indecent exposure conviction. During her conditional examination, Y. testified she saw defendant expose himself to N., but as discussed in more detail, *post*, this conduct was not the basis for the indecent exposure charge. We reject as undeveloped defendant's assertion that the conditional examination testimony was "propensity evidence" of "a touching involving N." Issues unsupported by substantive argument or citation to authority are waived. (*Upshaw v. Superior Court* (2018) 22 Cal.App.5th 489, 504 & fn. 7.)

## II.

Defendant next contends the trial court erred by admitting the children's forensic interviews (interviews) pursuant to Evidence Code section 1360, which " 'creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse.' " (*People v. Mitchell* (2020)

---

[7] Defendant maintains that had Y.'s conditional examination been excluded, so too would have her forensic interview. The Attorney General does not disagree.

46 Cal.App.5th 919, 927.) We conclude the court properly admitted the interviews of N., R., and L.[8]

We provide relevant background to contextualize the claim. Before trial, the prosecutor moved to admit video recordings of the interviews conducted in Spanish and transcripts of the interviews translated into English. (Evid. Code, §§ 1360, 751, 753.) Defense counsel objected; according to counsel, admitting the interviews would violate defendant's constitutional rights to confrontation, due process, and a fair trial. Counsel also suggested the interviews may be cumulative under Evidence Code Section 352. The trial court provisionally granted the motion to admit the interviews. With the caveat it had not "seen these statements," the court concluded unless "something else" demonstrated the statements were unreliable, the interviews were admissible under Evidence Code section 1360. After R. testified, but before the prosecutor played her interview for the jury, the court revisited the reliability issue. It recited the relevant factors — spontaneity and consistent repetition, the declarant's mental state, use of terminology unexpected of a child of similar age, and lack of motive to fabricate. Then the court reminded the parties it had not reviewed the interviews, and it asked for an offer of proof on reliability.

The prosecutor made a detailed offer of proof regarding each factor. In response, defense counsel insisted the statements were not spontaneous because **[REDACTED]**. The court found R.'s interview sufficiently reliable and permitted the prosecutor to play the video for the jury. When it came time to play the videos of the other interviews, defense counsel submitted on her prior objections.

---

[8] We do not address the admissibility of Y.'s interview, as we have concluded count 1 must be reversed.

On appeal, defendant challenges the admission of the interviews on three grounds.  We address each argument, but find none persuasive.  Defendant first argues the trial court erred by failing to review the interviews before admitting them, but he did not make this request below, and he concedes a trial court may rely on an offer of proof when deciding whether to admit evidence.  (*People v. Holford* (2012) 203 Cal.App.4th 155, 174 (*Holford*).)  While the better practice would have been for the court to watch the videos and read the transcripts before ruling on their admissibility, the court's failure to do so was not an abuse of discretion.  (*People v. Diaz* (2014) 227 Cal.App.4th 362, 379; *Holford*, at p. 174; *People v. Pedroza* (2007) 147 Cal.App.4th 784, 795 [no error in relying on counsel's description of videotape without personally reviewing it].)  We have no reason to presume the court did not understand the nature of the evidence at issue, nor any reason to suspect the court was unable to make an informed decision as to Evidence Code section 1360's foundational requirements.  (*Holford*, at pp. 174–175.)

In arguing otherwise, defendant relies on *People v. Diaz*, *supra*, 227 Cal.App.4th 362, but that case does not assist him.  There, in a drunk-driving case, the prosecution sought to admit videos containing "highly emotional footage of victims and their families discussing the impact of alcohol-related crashes, unrelated to the charged offenses."  (*Id.* at p. 379.)  The prosecution submitted transcripts of the videos in connection with its offer of proof, but the trial court did not watch the videos before admitting them.  (*Ibid.*, fn. 11.)  *Diaz* faulted the court for failing to do so, but it took care to note it was *not* holding "a trial court necessarily commits reversible error by failing to view a video" before admitting it.  (*Ibid.*)  Moreover, the interviews bear little resemblance to the "large amount of extremely

19

prejudicial material" at issue in *Diaz*. (*Id.* at p. 380.) Finally, defendant has not demonstrated the "court's decision would have been different had it reviewed the [interviews] prior to making its ruling." (*Holford*, *supra*, 203 Cal.App.4th at p. 175.)

Defendant next contends the interviews are not reliable within the meaning of Evidence Code section 1360, which allows a trial court to admit a child's hearsay statement describing an act of child abuse upon that child if the court finds — in a hearing conducted outside the presence of the jury — the "time, content, and circumstances of the statement provide sufficient indicia of reliability," the statement is not otherwise inadmissible, and the child testifies at the proceedings or is unavailable but other evidence corroborates the abuse. (*Id.*, subds. (a)(1)–(3).)

The parties agree the following nonexclusive factors are relevant in determining reliability: spontaneity and consistent repetition; mental state of the declarant; use of terminology unexpected of a child of similar age; and lack of motive to fabricate. (*People v. Brodit* (1998) 61 Cal.App.4th 1312, 1330.) The child's ability to distinguish between truth and falsehood and to tell the truth is also a relevant factor (*In re Cindy L.* (1997) 17 Cal.4th 15, 34–35), but it does "not necessarily render the child's hearsay statements unreliable." (*Brodit*, at p. 1330.) "Courts have 'considerable leeway in their consideration of appropriate factors.' [Citation.] The 'unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made.'" (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1374.) We review the admission of evidence under Evidence Code section 1360 for abuse of discretion (*Brodit*, at pp. 1329–1330), and we uphold the trial court's findings leading to its

20

admissibility determination "if they are supported by substantial evidence." (*In re Lucero L.* (2000) 22 Cal.4th 1227, 1249.)

Here, the time, content, and circumstances of the interviews provide sufficient indicia the statements are reliable. (Evid. Code, § 1360, subd. (a)(2).) A police officer interviewed each child shortly after the alleged abuse was reported, with no family members present. The officer ensured each child could distinguish between truth and falsehood, and **[REDACTED]**. The officer also asked open-ended questions. (*People v. Eccleston* (2001) 89 Cal.App.4th 436, 440.) As to the first factor — spontaneity and consistent repetition — the statements were spontaneous in the sense **[REDACTED]** when the interviewer asked **[REDACTED]**. (*Id.* at pp. 442, 446.) Defendant correctly observes **[REDACTED]** may have been attributable to their young age — at the time of the interviews, N. was eight years old, and R. was only six years old. (*Id.* at p. 446.)

Regarding the second factor, nothing about the children's mental state indicates their statements were unreliable. **[REDACTED]**. The third factor — use of unexpected terminology — does not undercut the reliability of the children's statements. (*Eccleston*, at p. 447.) Finally — and despite defendant's fleeting assertion to the contrary — nothing in the interviews themselves suggests the children had a motive to fabricate. In sum, we conclude the trial court did not abuse its discretion in admitting the interviews, as substantial evidence supports its determination the statements contained sufficient indicia of reliability. (*Brodit*, at p. 1330.)

Lastly, defendant contends the interviews were more prejudicial than probative under Evidence Code section 352. This argument is forfeited. A party "may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial." (*Holford*, *supra*,

203 Cal.App.4th at p. 169.) In the trial court, defense counsel suggested the interviews might be cumulative, but she did not argue they were unduly prejudicial. Thus, the objection did not alert the court to the basis on which counsel now seeks to exclude the evidence. (Cf. *People v. Scott* (2015) 61 Cal.4th 363, 402 [argument preserved where trial court addressed undue prejudice].) Assuming for the sake of argument the claim is preserved, it fails on the merits. (*Holford*, at pp. 161, 167, 170–171, 175 [no abuse of discretion under Evid. Code § 352 in admitting 25-minute video containing "extremely graphic child pornography"].)

## III.

Defendant also asserts the trial court erred by admitting testimony that most child sexual abuse allegations are true. We conclude any assumed error is harmless.

By way of background, the prosecutor indicated she intended to call Dr. Urquiza as an expert witness on CSAAS. As relevant here, defendant urged the trial court to exclude testimony on the statistical probability child abuse victims are truthful. Such testimony, defendant argued, would run afoul of *People v. Julian* (2019) 34 Cal.App.5th 878, which held evidence regarding "the statistical percentage of false allegations by child sexual abuse victims" is inadmissible. (*Id.* at pp. 883, 886.) The prosecutor disclaimed an intention to elicit such testimony, and the court prohibited Dr. Urquiza from testifying as to the "percentage of allegations that appear to be false in child molestation situations," and from making statements that false sexual abuse allegations "don't happen very often." Before he testified, the court instructed the jury his testimony was "not evidence" defendant committed the charged crimes, and it admonished the jury to consider his testimony "only in deciding whether or not the conduct of the complaining witnesses was not

inconsistent with the conduct of someone who's been molested and in evaluating the believability" of the complaining witness's testimony.

During the defense case, Dr. O'Donohue testified it is "unusual" for a victim of child sexual abuse to not recall central details about the abuse, and that it is "very rare" for a victim to provide inconsistent core details about the abuse. On cross-examination, the prosecutor asked Dr. O'Donohue whether he had "published in the area of either false allegations or mistaken allegations," and he replied, "[c]orrect." Next, the prosecutor asked about an article he co-authored concluding "most allegations are true." Defense counsel objected. At a sidebar, the prosecutor insisted the question was appropriate because Dr. O'Donohue testified children make false disclosures, but defense counsel countered the testimony did not "open the door" to cross-examination regarding the percentage of truthful child abuse allegations. The trial court permitted the prosecutor to ask one question about whether false allegations are "common or uncommon," but cautioned counsel not to "get into any numbers." Thereafter, the prosecutor asked Dr. O'Donohue whether the article he co-authored concluded false allegations are uncommon. Over defense counsel's objection, he answered, "No. Well, what we did conclude is that most allegations are true."

On appeal, defendant asserts the trial court erred by permitting the prosecutor to elicit testimony from Dr. O'Donohue that most child abuse allegations are true because the testimony invaded the province of the jury. The Attorney General acknowledges the prosecution may not offer expert testimony on the statistical likelihood of false child abuse allegations during its case-in-chief, but asserts such evidence is proper on cross-examination. We express no opinion on this issue. Several courts have held this type of evidence is inadmissible because it violates "the general rule that an expert

23

may not give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 179 (*Lapenias*); *People v. Wilson* (2019) 33 Cal.App.5th 559, 570.) In light of this authority, we assume for the sake of argument the court erred by permitting the prosecutor to elicit testimony from Dr. O'Donohue that false child abuse allegations are uncommon.

We nevertheless conclude the assumed error is harmless, for it is not reasonably probable defendant would have achieved a more favorable result in the absence of the challenged testimony. (*People v. Prieto* (2003) 30 Cal.4th 226, 247.) Dr. O'Donohue's testimony was brief — his response to the prosecutor's question comprised two lines of a 50-page cross-examination, in a trial transcript spanning nearly a thousand pages — and the prosecutor did not mention the challenged testimony during closing argument. Moreover, defense counsel reminded the jury "this case is not about whether . . . people who make accusations of sexual abuse are reliable or righteous in their claims." The trial court instructed the jury it was not bound by an expert's opinion, it was the sole judge of witness credibility, and it could not consider testimony on CSAAS as evidence defendant committed a crime. (See CALCRIM Nos. 332, 226, 1193.) We presume the jurors understood and followed these instructions. (*Lapenias, supra*, 67 Cal.App.5th at p. 180.) Finally, the jury's acquittal on the sexual abuse charges suggests it was not swayed by Dr. O'Donohue's fleeting testimony that most child abuse allegations are true.

On this record, any error in allowing the prosecutor to elicit the testimony during Dr. O'Donohue's cross-examination was not prejudicial. (*Lapenias, supra*, 67 Cal.App.5th at p. 180; *People v. Wilson, supra*, 33 Cal.App.5th at pp. 568, 572; compare *People v. Julian, supra*,

24

34 Cal.App.5th at pp. 888–889 [jury was "bombarded" with evidence regarding the low statistical incidence of false allegations of child sexual abuse *and* presented with "a mountain of prejudicial statistical data"].) Defendant's argument to the contrary does not alter our conclusion — the length of the jury deliberations, its request to review Y.'s interview transcript, and its brief deadlock do not establish prejudice. Rather, these circumstances could suggest the jury carefully reviewed the evidence with respect to each charge and did not reach a verdict of guilt based upon Dr. O'Donohue's testimony. (See *People v. Walker* (1995) 31 Cal.App.4th 432, 436–439.) Finally, we reject defendant's contention that the admission of the challenged testimony violated his due process rights. (*Lapenias*, at p. 174.)

IV.

Defendant next contends the trial court violated his federal constitutional rights to due process and a fair trial by failing to give a unanimity instruction on count 6, indecent exposure. We disagree.

In a criminal case, the jury's verdict must be unanimous. (*Ramos v. Louisiana* (2020) ___ U.S. ___ [140 S.Ct. 1390, 1394–1395]; *People v. Russo* (2001) 25 Cal.4th 1124, 1132.) The jury must also unanimously agree the defendant is guilty of a specific crime. (*Russo*, at p. 1132.) When "the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) Thus, a unanimity instruction is not required if prosecution elects the specific act relied upon to prove the charge. (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) The prosecution makes an election by tethering the charge to a specific criminal act elicited from the testimony. (*People v. Brugman* (2021) 62 Cal.App.5th 608, 627; *People v. Wilson* (2020) 56 Cal.App.5th 128, 162.)

Here, the prosecutor presented evidence defendant exposed himself to Y., N., and R. on more than one occasion. But no unanimity instruction was required because she told the jury during closing argument that count 6 applied to the incident when defendant exposed himself to R. in his bedroom doorway. After summarizing the elements of indecent exposure, the prosecutor argued defendant "came out of the shower one day with his towel wrapped around his waist, nothing on underneath, sees (R.) standing in the doorway of the bedroom . . . . And he opened up that towel and he showed me the thing men have, in [her] words. He showed me the thing men have." On this record, we have no difficulty concluding the prosecutor elected the specific act relied upon to prove count 6. (*People v. Brugman*, *supra*, 62 Cal.App.5th at pp. 629–630; *People v. Jantz* (2006) 137 Cal.App.4th 1283, 1292.)

The prosecutor's election was not — as defendant insists — "unclear." True, the prosecutor urged the jury to reject testimony from a defense witness that defendant always emerged from the bathroom fully clothed. But the prosecutor's comment, made in the context of urging the jury to reject the defense theory of the case — that Yesenia fabricated the charges to obtain asylum — was unlikely to confuse the jury regarding the election. Likewise, the prosecutor's references during closing argument to charges against other victims did not render the election ambiguous. (See *People v. Wilson*, *supra*, 56 Cal.App.5th at p. 162.)

V.

Defendant's penultimate contention is the trial court abused its discretion by imposing postconviction protective orders prohibiting him from contacting Y., N., and R. Not so.

26

Defendant's indecent exposure conviction obligated him to register pursuant to section 290, subdivision (c). At sentencing, the prosecutor requested 10-year protective orders barring defendant from contacting the three girls pursuant to section 136.2, subdivision (i)(1). As relevant here, the statute provides that when a defendant has been convicted of an offense requiring registration pursuant to section 290, subdivision (c), the court "shall consider issuing an order restraining the defendant from any contact with a victim of the crime" for "up to 10 years." The trial court imposed the protective orders over defense counsel's objection.

For the first time on appeal, defendant asserts the trial court lacked authority to issue protective orders as to Y. and N. because they are not "victims" within the meaning of section 136.2. Though this claim is cognizable on appeal, it lacks merit.[9] For purposes of a protective order issued under section 136.2, "victim" includes any "person with respect to whom there is reason to believe that any crime as defined under the laws of this state . . . has been perpetrated or attempted to be perpetrated." (§ 136, subd. (3).) Courts interpret the term victim "broadly to include any individual against whom there is 'some evidence' from which the court could find the defendant had committed or attempted to commit some harm." (*People v. Race* (2017) 18 Cal.App.5th 211, 219.) Indeed, "the subject of a protective order pursuant to section 136.2, subdivision (i)(1) need not be a named victim of one of the offenses for which the defendant [has been] convicted." (*Ibid.*) Furthermore, when considering whether to issue

_____

[9] Defendant also contends the protective order is unwarranted because the harm caused by indecent exposure is minimal, and he is unlikely to reoffend. This assertion — which was not raised in the trial court — is forfeited. (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93.) We likewise decline to consider defendant's cursory claim that defense counsel was ineffective for failing to raise it below. (*Ibid.*)

a protective order pursuant to this statute, a "court is not limited to considering the facts underlying the offenses of which the defendant finds himself convicted." (*Id.* at p. 220.) Instead, the "court may consider all competent evidence before it." (*Ibid.*)

The prosecutor offered evidence defendant touched **[REDACTED]**. Reviewing the record in the light most favorable to the trial court's order, we conclude there is "some evidence" defendant harmed, or attempted to harm, Y. and N. (*People v. Race, supra*, 18 Cal.App.5th at p. 219; *People v. Therman* (2015) 236 Cal.App.4th 1276, 1279.)

*People v. Delarosarauda* (2014) 227 Cal.App.4th 205 does not compel a contrary conclusion. *Delarosarauda* held the victim's children were not victims within the meaning of section 136.2, subdivision (i)(1) because there was no reason to believe any crime "had been perpetrated or attempted to be perpetrated" against the children — the victim testified the defendant " 'never touched' the children," no evidence suggested he attempted to harm them, and the victim "thought the children were in another room at the time of the incident." (*Delarosarauda*, at p. 211.) Here, by contrast, there was reason to believe crimes had been committed against Y. and N. Accordingly, the trial court was authorized to issue a protective order as to them. (See *People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 467.)

VI.

Finally, defendant argues the cumulative effect of the claimed errors requires reversal of all convictions. In some circumstances, a series of errors, though independently harmless, may — when considered in the aggregate — rise "to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844; *Lapenias, supra*, 67 Cal.App.5th at p. 180.) A

28

cumulative error claim "is in essence a due process claim . . . . 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) We conclude the prejudicial error necessitating reversal of count 1 and any assumed error does not, when considered cumulatively, require reversal of all convictions. (See *People v. Robinson* (2005) 37 Cal.4th 592, 637.)

## DISPOSITION

Count 1 — the conviction for battery against Y. — is reversed, and the matter is remanded to the trial court for further proceedings not inconsistent with this opinion. In all other respects, the judgment is affirmed.

_____
Rodríguez, J.

WE CONCUR:

_____
Fujisaki, Acting P. J.

_____
Petrou, J.

A163906