[No. B189682. Second Dist., Div. Four. Feb. 13, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVE CHRISTOPHER PEDROZA, Defendant and Appellant.
In re STEVE CHRISTOPHER PEDROZA on Habeas Corpus.

785

## Counsel

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SUZUKAWA, J.**—Defendant Steve Christopher Pedroza appeals from the judgment entered after a jury convicted him of first degree murder and arson of an inhabited structure. (Pen. Code, §§ 187, subd. (a), 451, subd. (b).)[1] He contends the trial court erred when it admitted the victim's out-of-court

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise indicated.

statements and a videotape of a demonstration performed by a prosecution expert. We find no error and affirm the judgment.

Defendant also filed a petition for a writ of habeas corpus alleging his counsel was ineffective for failing to raise an appropriate objection to the admission of the victim's statements. As we address the principal issue in the appeal, the petition is moot and is therefore dismissed.

## STATEMENT OF FACTS

*The Prosecution Case*

Defendant lived in a home in Whittier with his wife, Teresa Rodriguez, and their 16-year-old son Steve Pedroza.[2] On June 20, 2004, around midnight, Steve was home with his mother. About 1:00 or 2:00 a.m., Steve heard defendant return to the house. As Steve watched television in his bedroom, he heard his parents arguing. He could not understand what they were saying, but both were yelling. The argument appeared to begin in the living room. After a few minutes, his parents moved to the kitchen and then into the backyard. They were still arguing.

At one point, Steve heard defendant say, "Light it up." Steve believed his parents were outside at the time. He heard the doors open to a shed which was in the backyard. His parents came back into the house and continued to argue. Steve then heard defendant call his name. Steve's mother told defendant not to bring Steve into it. Defendant came into Steve's room and told him to get his shoes and leave the house. Defendant seemed calm at the time. Defendant left while Steve put on his shoes. As Steve was walking out of the house, he turned around and saw the kitchen on fire. He saw defendant standing near the kitchen. Defendant appeared to be looking at the fire and did not seem to be upset. Steve did not see his mother.

As Steve rushed out of the house, he noticed defendant was following behind him. Defendant went to the side of the house, returned with a water hose, and went back inside the house. Steve heard his mother calling "Steven," so he went toward the backyard. He saw his mother lying on the grass. She was burned over her chest and shoulders and was crying. She did not appear to be wet, and the grass around her was dry. She asked where defendant was and Steve replied he did not know. She told Steve to go to his brother Johnny's house, which was on the next block. He went to his brother's house and told him about the fire. Johnny ran back to defendant's house.

---

[2] We refer to defendant's son as Steve to avoid confusion, with no disrespect intended.

Whittier Police Officer Nathan Ellis was on routine patrol about 1:30 a.m., on June 20, 2004, when he received a call of a possible house fire. He responded to the call and arrived at defendant's house in approximately 20 to 30 seconds. Sergeant Lamping, also a Whittier officer, was at the location. Officer Ellis noticed that the front door of the residence was open and smoke was emitting from inside. He entered the location with Sergeant Lamping. Officer Ellis saw defendant lying on his stomach spraying the fire in the kitchen with a garden hose. He grabbed defendant and told him they needed to get out of the house. Defendant stood up and walked out.

Officer Ellis heard a female voice calling for help. The two officers went to the two bedrooms in the house, but did not find anyone. When the officers went outside, Ellis saw the victim, Teresa Rodriguez, on the grass in the yard adjacent to the house. She was lying on her back, clothed only in underwear. She covered her upper torso with a sweatshirt. Rodriguez was moaning and appeared to be in extreme pain. She was burned and bleeding and skin was hanging off of her arms and face. Officer Ellis asked her what happened. She told him that Steve burned her. When he asked her how, she replied he threw gas on her. She told him that Steve lived at the residence. He spoke with Rodriguez for approximately 10 to 15 seconds.

Officer Ellis saw defendant standing on the sidewalk. He approached defendant and asked him if his name was Steve. When defendant responded it was, Ellis placed him under arrest. Defendant's demeanor was calm and he did not appear to be under the influence of alcohol.

Officer Dean Montgomery responded to defendant's home. When he arrived, other officers were present. He saw Rodriguez lying on the grass. Paramedics had not yet arrived and the house was still on fire. Rodriguez was burned and appeared to be in pain, as she was moaning and shaking. When he asked her who had burned her, she said it was her husband. She said they had an argument and she doused his tools, which were in the kitchen area, with gasoline. As they continued to argue, he went to the stove and lit a piece of paper from the burner on the stove. He said to her, "You're going to die," and threw the burning paper at her feet, where she was standing near the tools. She and the tools caught fire.

Sergeant Lamping also saw Rodriguez outside on the grass. She was badly burned and screaming for help. When he asked her what happened, she told him that Steve had thrown gas on her and burned her. He was with Rodriguez for just a few seconds. He did not see defendant near his wife at any time while she was lying in the yard.

Officer Kenneth Woods also responded to defendant's home during the early morning hours of June 20. When he arrived, Sergeant Lamping asked

him to transport defendant to the station for booking. While driving to the station, he asked defendant his name as part of the booking process. Defendant replied, "Elmer Fudd." Once at the station, Officer Woods began filling out the booking forms. He asked defendant if he had any medical problems. Defendant became agitated and wanted to know why the question was being asked. The officer explained to defendant that questions concerning a suspect's medical history were for the suspect's benefit. Defendant responded, "[J]ust put me in a cell by myself with my belt and I'll take care of it." When Officer Woods said he could not do that, defendant said, "[C]ome on, just take me out back and just put a bullet in my head." When the officer said that was not a solution to his problems, defendant became withdrawn and began mumbling to himself. Officer Woods noticed that defendant's clothes were saturated and had a strong odor of gasoline.

Detective Samuel Reed conducted a videotaped interview of defendant. He asked defendant how the fire started. Defendant said initially that the fire was caused by a burner on the stove that was heating a tea kettle. The detective told defendant that he did not believe him. Defendant then said he lit a paper towel. When he threw the burning towel in the sink, his wife ignited and ran out the back door. Defendant said he got a hose and extinguished the flames on his wife.

A deputy medical examiner testified that the victim suffered second and third degree burns over 75 percent of her body and died due to complications caused by those injuries.

Clifford Houser is a fire investigator for the Los Angeles County Fire Department and the lead investigator in the instant case. In the company of another arson investigator and a fire captain, he examined defendant's home after the fire. He found what appeared to be a spout to a gasoline container in the living room. He found the remains of a plastic gasoline container on the kitchen floor. Looking at the burn patterns in the kitchen, Houser eliminated the appliances located in the kitchen and the nearby laundry room as possible sources of ignition. He also eliminated the electrical connections to those appliances as possible sources. He noticed that the knob to one of the burners on the stove was partially on, set between the off and light position. The light position is where the knob is turned to operate the pilotless ignition on the stove.

Houser found fire debris inside the kitchen sink, consistent with a burned washcloth. He opined that a paper towel could not have caused the burn pattern in the sink, as it burns too quickly. He stated the fire did not start in the sink, but was caused by an open flame. Even though both defendant and the victim had gasoline on their clothing, the fire was not started by turning

on a burner on the stove because the burner was too high off the ground. Based on the location of the burned gasoline can, Houser believed the victim was standing away from the sink near a corner of the kitchen when she caught fire. He stated defendant could not have been standing in the general area where the victim ignited, as he would have caught fire as well.

The parties stipulated that defendant's clothing, victim's clothing, and the remnants of the gasoline container in the kitchen all contained partially burned gasoline.

## The Defense Case

Anthony Lapalio is a private investigator. He worked as an arson investigator with the Los Angeles City Fire Department and left in 1990. He has investigated approximately 3,500 fires.

He would have collected all of the appliances in the vicinity of the fire, even though they were eliminated as a source of ignition. Lapalio opined that defendant was not in the same room when the victim caught fire because defendant's clothing was soaked in gasoline and he would have ignited as well. For that reason, although defendant said he started the fire with a lit paper towel, was in the kitchen at the time the fire started, and saw the flames burn his wife, he was incorrect. Lapalio stated that the flame on a lit paper towel that was thrown would probably burn out before the towel hit the ground.

## The Rebuttal Case

Glen Lucero is an arson investigator with the Los Angeles City Fire Department and was formerly Lapalio's partner. Los Angeles City Fire Department policy does not require investigators to collect appliances as evidence once they are eliminated as possible sources of ignition. When Lapalio worked with the department, he did not collect every possible source of ignition.

Clifford Houser performed a videotaped demonstration during which he lit a paper towel and threw it on the ground. The paper did not extinguish in midair, and continued to burn as it lay on the ground. He looked at the particles of paper towel that remained after the flame went out. He did not see similar particles in the kitchen sink in defendant's home when he examined it after the fire.

## DISCUSSION

As set forth above, several deputies testified to Teresa Rodriguez's statements regarding how she was burned. The trial court found that her statements were spontaneous declarations, and admitted the deputies' testimony pursuant to Evidence Code section 1240. Defendant argues the statements were inadmissible hearsay and violated his Sixth Amendment right to confrontation as set forth in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). We disagree.

■ We first address defendant's claim that the victim's hearsay statements do not qualify under the exception set forth in Evidence Code section 1240. An out-of-court statement is admissible pursuant to this section if it "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant." (Evid. Code, § 1240, subd. (a).) The statement must also have been "made spontaneously while the declarant was under the stress of excitement caused by such perception." (*Id.*, subd. (b).) "[T]he decision whether to admit a statement as a spontaneous utterance lies within the discretion of the trial court." (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1290 [280 Cal.Rptr. 584].)

Defendant acknowledges that the mere fact a declarant responds to questioning does not render the resulting statement inadmissible. (*People v. Farmer* (1989) 47 Cal.3d 888, 903–904 [254 Cal.Rptr. 508, 765 P.2d 940], overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) However, he argues that the victim's "statements were not spontaneous because they were the product of detailed police questioning." Defendant's characterization of the questioning as "detailed" is off the mark.

Both Officer Ellis and Sergeant Lamping encountered the victim and asked one question: What happened? Ellis followed up by asking Rodriguez how she was burned. Lamping asked nothing else. In response, the victim said that Steve threw gas on her and burned her. Officer Ellis estimated that he spoke to the victim for approximately 10 to 15 seconds. Sergeant Lamping said he was with her for a few seconds. The victim's response, given minutes after she had sustained severe burns and while she was still suffering from the resulting intense pain, certainly suggests her statements were the product of the stress of the moment, not deliberation.

■ The testimony of Officer Montgomery presents a slightly closer question. While he spoke to the victim for about five minutes and asked more questions than the other officers, the evidence supports the trial court's finding that the victim's answers were nonetheless spontaneous. One of the

reasons for the more extensive questioning was that the victim was having difficulty providing more than one-word answers. She was moaning in pain and shaking. At one point, she asked the officer how she looked. At another, she reached out and asked the officer to hold her hand. While she was being questioned, there is little doubt that the pain she experienced and the concerns she had for her well-being precluded any motive to give a false account of what had occurred. (See *People v. Farmer, supra,* 47 Cal.3d at p. 904.) The victim's statements regarding how she was burned were properly admitted as spontaneous declarations pursuant to Evidence Code section 1240.[3]

■  We now consider defendant's second challenge. Did the admission of the victim's statements violate defendant's right to confrontation as defined by *Crawford?* In *Crawford,* the Supreme Court held that the Sixth Amendment bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. at pp. 53–54.) While the Supreme Court failed to give a precise definition of "testimonial statements," it did find that certain statements, such as those taken by police officers in the course of an interrogation, clearly qualified. (*Id.* at p. 53.) Defendant argues the victim's statements "were clearly made in response to police questioning intended for investigation, prosecution, and potential use at a judicial proceeding."

In *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*),[4] the Supreme Court further defined testimonial statements as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822 [126 S.Ct. at pp. 2273–2274], fn. omitted.)

In *Davis,* the court had to determine whether the victim's statements made in the course of a 911 call were the product of an interrogation that produced testimonial statements. The court concluded they were not, and were therefore admissible. The court noted that in the present case, the victim was "speaking about events *as they were actually happening,* rather than 'describ-[ing] past events . . .' [citation]." (*Davis, supra,* 547 U.S. at p. 827 [126 S.Ct.

---

[3] Given our conclusion, we need not address the Attorney General's claim that the victim's statements were also admissible as dying declarations. (Evid. Code, § 1242.)

[4] *Davis* considered the testimonial nature of statements made in connection with two separate appeals which were consolidated for hearing and decision in the Supreme Court.

at p. 2276].) The court noted that the witness in *Crawford* was interrogated "hours after the events she described had occurred." (*Ibid.*) The court concluded that the victim in *Davis* "simply was not acting as a *witness*; she was not *testifying.*" (*Id.* at p. 828 [126 S.Ct. at p. 2277].)

In contrast, in the companion case to *Davis*, *Hammon v. Indiana* (*Hammon*), the court deemed a witness's prior statement inadmissible, as it was testimonial in nature and the product of a police interrogation. In *Hammon*, the police responded to a domestic disturbance call. At the location, the officers encountered a woman on the porch who appeared frightened. She said nothing was wrong. After receiving permission to enter the home, the officers went inside and saw Hammon. Hammon said that he and his wife had been in an argument, but the disagreement was over. The officers separated Hammon and his wife in order to investigate what had happened. One officer asked the wife to give her account. She told the officer that Hammon had struck her. At this point, the officer " 'had her fill out and sign a battery affidavit.' " (*Davis, supra*, 547 U.S. at p. 820 [126 S.Ct. at p. 2272].) The wife prepared a handwritten statement, which was admitted in a subsequent bench trial in lieu of her testimony.

In concluding that the statement was the product of an interrogation, the court noted the questioning "was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].' . . . What we called the 'striking resemblance' of the *Crawford* statement to civil-law *ex parte* examinations, 541 U.S., at 52, 124 S.Ct. 1354 [158 L.Ed.2d 177], is shared by [the wife's] statement here. Both declarants were actively separated from the defendant—officers forcibly prevented [Hammon] from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Davis, supra*, 547 U.S. at p. 830 [126 S.Ct. at p. 2278], fn. omitted.)

Examining the facts of our case, we conclude the victim's statements were neither testimonial nor the product of a formal police interrogation. First, the officers encountered the victim during an ongoing emergency. At the time, the home was still actively burning and the badly injured victim had not yet received medical care. The officers were attempting to ascertain the nature of the situation. By discovering how the fire took place, the officers appropriately determined whether they were at the scene of an accident or a crime, whereby they would need to know if there was a suspect who could pose a danger to the officers or to others. Second, the officers' conversations with the

victim were brief. In fact, one of the officers asked her one question; a second officer asked her two. A third spoke to the victim for approximately five minutes, but the length of the conversation was due, in part, to the victim's difficulty in speaking. In addition, the officer did not spend the entire time questioning the victim, as he also assured her that she looked fine and attempted to offer her comfort. The primary purpose of the inquiry was "to enable police assistance to meet an ongoing emergency." (*Davis, supra,* 547 U.S. at p. 822 [126 S.Ct. at p. 2273].) Third, the statements were hardly taken under the calm circumstances of a formal interrogation. They were not the result of a tape-recorded statement taken at a police station, as in *Crawford,* or a handwritten account prepared in a room with an officer nearby, as in *Hammon.* Nor did the statements purport to describe past events that had occurred some time ago.

■ We also focus on the nature of the victim's statements. We have concluded they were spontaneous declarations. In *People v. Corella* (2004) 122 Cal.App.4th 461 [18 Cal.Rptr.3d 770], the court found that statements made to a 911 operator were spontaneous declarations and not testimonial statements under *Crawford.* The court stated: "[I]t is difficult to identify any circumstances under which a section 1240 spontaneous statement would be 'testimonial.' The rationale of the spontaneous statement exception to the hearsay rule is that the utterance must be made without reflection or deliberation due to the stress of excitement. [Citation.]" (*Id.* at p. 469.) The court noted that although the statements were ultimately used in a criminal prosecution, "statements made without reflection or deliberation are not made in contemplation of their 'testimonial' use in a future trial." (*Ibid.*) We agree with the court's analysis. The admission of the victim's statements did not violate defendant's Sixth Amendment right to confrontation.

Defendant argues the trial court erred when it admitted the videotaped demonstration of Investigator Houser lighting a paper towel and throwing it to the ground. When Houser conducted the demonstration, he was wearing a protective suit and his hands were doused with gasoline. The prosecutor argued that the evidence was relevant to rebut two areas of Anthony Lapalio's testimony: one, that a lit paper towel would extinguish in midair when thrown and could not have started the fire by hitting the gasoline-soaked floor in the kitchen; and two, that defendant could not have been in the kitchen at the time of the fire, because he was covered in gasoline and would have ignited. The court sustained defendant's objection and ruled the prosecutor could not present any evidence tending to prove whether an open flame would have caused defendant to catch fire. The court reasoned that the circumstances under which the demonstration was performed were different than those present at the time of the fire. However, it did allow the jury to see "the demonstration of a paper towel being burned."

■ "In ruling upon the admissibility of a videotape, a trial court must determine whether: (1) the videotape is a reasonable representation of that which it is alleged to portray; and (2) the use of the videotape would assist the jurors in their determination of the facts of the case or serve to mislead them." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1114 [36 Cal.Rptr.2d 235, 885 P.2d 1].) The demonstration must also be relevant and "must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence." (*People v. Turner* (1994) 8 Cal.4th 137, 198 [32 Cal.Rptr.2d 762, 878 P.2d 521].) "We reverse decisions to admit or exclude such evidence only when the trial court has clearly abused its discretion." (*People v. Boyd* (1990) 222 Cal.App.3d 541, 565–566 [271 Cal.Rptr. 738].)

Defendant argues that the trial court failed to exercise its discretion because the record does not reflect that it "actually reviewed the videotape before it was admitted into evidence. Instead, the trial court relied on the representation of the prosecution as to the depictions in the videotape." Therefore, he claims, the trial court failed to consider all of the relevant evidence bearing on the issue. We disagree.

Initially, the record is silent as to whether the trial court viewed the videotape. Even if we were to assume that the court did not personally view the recording, defendant provides no authority for the proposition that a trial court may not rely on counsel's description of proffered evidence. Although it may have been more prudent for the trial court to have looked at the videotape, there is no reason to presume it did not appropriately understand the nature of the evidence in question. This is especially so given the simple nature of the demonstration and the lack of any claim that the prosecutor inaccurately described the contents of the videotape.

Defendant argues "a review of the videotape reflects the circumstances are far different from those involved in the case." He points out that the investigator was in full fire gear in a concrete room with a concrete floor, while he was in gasoline-soaked clothing standing in a kitchen. Defendant claims there were other differences between the site of the demonstration and the scene of the fire. While defendant is correct, the trial court took that into consideration when it prohibited the prosecution from presenting the videotape as evidence to refute the defense expert's claim that defendant could not have been in the kitchen at the time of the fire. The videotape and the testimony of Investigator Houser were presented for the simple point that a paper towel does not necessarily extinguish in midair when thrown.

We find it difficult to accept defendant's argument that a videotape depicting an individual lighting a paper towel and throwing it on the ground

is not a reasonable representation of the claim that paper continues to burn when tossed. The demonstration gave the jury visual evidence to use in weighing the defense expert's testimony that it does not. Nor can we say that the demonstration was not carried out under sufficiently similar circumstances, given the simplicity of both the demonstration and the point it was attempting to make. We cannot conclude that the trial court abused its discretion when it allowed the use of the videotape.

## DISPOSITION

The judgment is affirmed. The petition for a writ of habeas corpus is dismissed.

Epstein, P. J., and Willhite, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 9, 2007, S150898.