Filed 10/8/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOEL SANMIGUEL,<br><br>    Defendant and Appellant. | 2d Crim. No. B328160<br>(Super. Ct. No. 2022002116)<br>(Ventura County) |

Joel SanMiguel appeals from a judgment following a trial at which the jury found him guilty of willful, deliberate, and premediated attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a), 189) (count 1) and assault with a deadly weapon (*id.*, § 245, subd. (a)(1)) (count 2). As to both counts, the jury found true allegations that SanMiguel personally inflicted great bodily injury. (*Id.*, § 12022.7, subd. (a).) As to count 1, the jury also found SanMiguel personally used a deadly and dangerous

---

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

weapon. (*Id.*, § 12022, subd. (b)(1).) The court sentenced SanMiguel to a total term of 11 years to life. We affirm.

FACTS

Rosario Soto lived with his girlfriend, Emperatriz Marroquin, at a homeless encampment in Thousand Oaks known as "the Jungle." Marroquin had been friends with SanMiguel for three or four years and knew him as "Capi." SanMiguel did not live at the Jungle but visited frequently.

*Events of January 8, 2022*

At about 8:00 p.m. on January 8, 2022, Soto and Marroquin were in their small, wooden home at the Jungle when they heard a disturbance. They stepped outside, and Soto put on a headlamp. Marroquin saw SanMiguel and Hugo Arias running toward a man she knew as Mike. SanMiguel was holding a thick, black metal bar and Arias had a baseball bat. SanMiguel and Arias attacked Mike, but he was able to get away.

Soto's headlamp illuminated the attack. SanMiguel approached Soto and told him to turn off the headlamp. Soto tried to comply but could not turn it off. SanMiguel struck Soto in the head with the metal bar. Soto fell to the ground unconscious.

Marroquin begged SanMiguel to leave Soto alone, but SanMiguel took the bat from Arias and struck Soto on his legs or feet with it. Still unconscious, Soto did not react. Marroquin got down on the ground and placed her body over Soto to protect him. SanMiguel struck Soto on his head right next to Marroquin's face. SanMiguel told Marroquin to move. She did not move and again begged SanMiguel to leave Soto alone. SanMiguel and Arias walked away.

Marroquin called 911. She told the operator that the person who hit Soto with a metal bar and bat was an older Hispanic person named Capi. Sheriff's Deputy Paul Zamora responded to the call. He found Soto lying on the ground with a large laceration to his head.

Zamora asked Soto several open-ended questions, but Soto did not respond. Because the radio dispatch call identified Capi as a suspect, Zamora asked Soto, "Is Capi the one that did this to you?" Soto nodded his head up and down two or three times. Zamora said the nodding was a "very deliberate act." Soto was not moving his head from side to side. "It was just a straight up and down head nod." Zamora was wearing a body camera but the glare from his flashlight obscured Soto's head.

An ambulance took Soto to the hospital where he remained for three days. On discharge Soto had 10 staples in his head.

Sheriff's deputies went to SanMiguel's home. His wife answered the door. A deputy called out SanMiguel's name and a male voice responded. A deputy looking through a window could see SanMiguel moving toward the back of the house. The deputy heard a sliding glass door open and the sound of someone trying to climb the back fence. The deputy saw SanMiguel at the rear of the residence. The deputy shouted, "Sheriff's Department, stop." SanMiguel did not comply. He was hiding in the backyard when deputies arrested him.

The deputies took SanMiguel to the Thousand Oaks police station. After being advised of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 430, he agreed to talk. SanMiguel said that on January 8, 2022, he had gone to the park with his son in the late morning and to a liquor store between 2:00 and 3:00 p.m. The park and store are near the Jungle. But he claimed he was

at home with his children when Soto was assaulted. He did not see anyone who could testify to his whereabouts that day.

Michelle Rodriguez testified that on the night of January 8, 2022, she heard SanMiguel's distinctive voice near her tent in the Jungle.

Jessica Geiser, an intelligence analyst with the sheriff's department, testified that records of SanMiguel's cell phone show him to have been in the vicinity of the Jungle from between 7:18 p.m. and 9:11 p.m. on the night in question. Had SanMiguel been at home with his children that night, it is unlikely his cell phone would have used the same cell towers.

*(a) Defense*

SanMiguel testified in his own defense. He denied he went to the Jungle at any time on January 8, 2022, or any time after Christmas. He said he had a good relationship with everyone at the Jungle. He often went to the Jungle to bring blankets and food or to play baseball. Soto was one of his closest friends. He last saw Soto two or three weeks before Christmas.

SanMiguel said he did not know Soto had been injured until he was interviewed by the police after he was arrested. SanMiguel denied trying to flee from the police when he was arrested. He said he was in the backyard to put a cover on a birdcage.

SanMiguel said he was mistaken when he told the police he was home all evening on January 8, 2022. He had the day confused with a Mexican holiday. He said at about 5:45 p.m. he walked 30 minutes to a Vons store. He returned home about 7:30 p.m. and stayed home with his wife and children for the rest of the night.

Robert Aguero testified as an expert in cell phone tower data analysis. He said determining where SanMiguel's cell phone was between 7:18 p.m. and 8:45 p.m. would be pure guesswork.

### (b) Jury Selection

During the trial court's voir dire, prospective juror S.M. provided basic information like his name and place of residence. S.M. had a Hispanic surname. He was a college student studying film at UC Santa Barbara. He was single with no children and no prior experience serving as a juror. When the court asked if he thought he could be a fair and impartial juror on a case like this, S.M. replied, "I think so."

In response to a question from SanMiguel's counsel, S.M. provided an 85-word answer explaining why he would "[n]ot necessarily" think a non-testifying defendant was hiding something or did something wrong. SanMiguel's counsel later asked whether S.M. could draw his own conclusions despite his youth. S.M. stated, "I think I would be considering all the information that's presented." When asked if he could adhere to his own beliefs, S.M. replied: "I think I would be able to. I think I have a strong ground to my own thoughts as to what I would believe."

The prosecutor asked S.M. whether he would require the victim to testify to reach a decision. S.M. responded: "I don't think I would require him to speak specifically." The prosecutor directed no other questions to S.M. in particular.

The prosecutor exercised a peremptory challenge to excuse S.M., and SanMiguel's counsel objected based on Code of Civil

Procedure section 231.7.[2]  SanMiguel's counsel indicated SanMiguel is of Latino descent and that S.M. was apparently "the only Latino man left of the 18."

When asked to justify the strike, the prosecutor noted the victim in the case was also Hispanic.  The prosecutor "wouldn't have a reason to kick Hispanic people when [he had] a Hispanic on Hispanic crime."  The prosecutor indicated S.M.'s "responses were extremely brief" and S.M. "didn't have much of anything to say."  The prosecutor added:  "There are other people in the following six . . . that I believe will be jurors that I prefer more to [S.M.]"  The prosecutor stated a different prospective juror had a Hispanic surname and he had not challenged her.  That prospective juror ultimately did serve as a trial juror.  The prosecutor concluded his initial justification by asking the court to make a finding that he "did not violate [section 231.7] by excusing someone just because he happens to be Hispanic."

The trial court sought clarification on the explanation.  The prosecutor stated, "It was that [S.M.] had very brief responses, that he did not have much to say about what my questions were."  The prosecutor added that S.M. did not fully follow the court's orders because he walked out of the courtroom with papers—apparently, the court's questionnaire—and walked back in during breaks.  When the court indicated it gave no orders about leaving with the questionnaire, the prosecutor said:  "Okay.  Just the fact that he walked back in when the rest of the jury had already been excused. . . .  [Y]ou look at these small little things of what jurors are doing and how close they're paying attention to the

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

6

process, and those are things that you pick up on versus what other jurors are doing or are not doing."

The prosecutor continued: "Eye contact that they're making, body language that they have, you know, other jurors are being – I feel like they're being more attentive. They're giving more eye contact to me where he's kind of looking down. I don't feel like he's being as engaged as other people are, and there's no – there's absolutely no pattern. I have zero intent of kicking [another prospective juror] who I believe is also a Hispanic juror."

The trial court confirmed "exactly what the prosecutor did say, though, about [S.M's] body language." The court said, "I did notice that too, that [S.M.] has a very flat affect, and he is looking down most of the time. He is not responding to questions the same way everybody else does. There is no – he's not making eye contact at all. He was doing the same thing with the Court. I did notice that, and I did take note of that." The court denied the section 231.7 objection. The court then noted, "[S.M. entered] the courtroom at a time when nobody else did, which I don't think that's a violation of a Court order, necessarily, but it shows that he's not paying attention to what everybody else is doing . . . ."

DISCUSSION

*I. Objection to Peremptory Challenge*

SanMiguel contends the trial court erred in denying his section 231.7 objection to the peremptory challenge of S.M.

Section 231.7, subdivision (a) provides: "A party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror

7

in any of those groups."  The Legislature implemented a complex statutory scheme to ensure parties do not violate this prohibition.

Once a party objects to the use of a peremptory challenge as violative of section 231.7, subdivision (a), the party exercising the challenge must state the reasons it did so.  (§ 231.7, subds. (b), (c).)  The court evaluates those reasons "in light of the totality of the circumstances," without speculating on or assuming the existence of other possible justifications.  (*Id*., subd. (d)(1).)  "If the court determines there is a substantial likelihood that an objectively reasonable person would view [actual or perceived cognizable group membership] as a factor in the use of the peremptory challenge, then the objection shall be sustained.  The court need not find purposeful discrimination to sustain the objection." (*Ibid*.)  Indeed, under section 231.7, "an objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors" in California.  (*Id*., subd. (d)(2)(A).)

Section 231.7, subdivision (d)(3) provides a non-exhaustive list of circumstances the court may consider in evaluating the reasons given to justify a peremptory challenge.  The enumerated circumstances include whether the objecting party is a member of the same perceived cognizable group as the challenged juror, as well as whether the alleged victim or witnesses are not members of that group.  (*Id*., subd. (d)(3)(A)(i)-(iii).)  Trial courts are to consider "whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge" (*id*., subd. (d)(3)(C)(i)), and "[w]hether the party exercising the peremptory challenge engaged in cursory questioning of the challenged potential juror" (*id*., subd. (d)(3)(C)(ii)).

8

Section 231.7, subdivisions (e) and (g) provide two separate lists of presumptively invalid reasons for exercising a peremptory challenge. "Each subdivision sets out a distinct process by which a court determines whether a presumptively invalid reason can be absolved of that presumption." (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 793.)

Section 231.7, subdivision (g)(1) identifies the following reasons for peremptory challenges as having been "historically . . . associated with improper discrimination in jury selection:

"(A) The prospective juror was inattentive, or staring or failing to make eye contact.

"(B) The prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor.

"(C) The prospective juror provided unintelligent or confused answers."

Procedurally, section 231.7, subdivision (g)(2) provides that these reasons "are presumptively invalid unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party. Even with that confirmation, *the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried.*" (Italics added.)

We review the overall denial of a section 231.7 objection de novo, but we review the trial court's express factual findings for substantial evidence. (*Id.*, subd. (j).) The statute precludes appellate courts from imputing any findings to the trial court. (*Ibid.*) Likewise, the reviewing court can consider only the reasons stated under section 231.7, subdivision (c)—that is, the party's actual justification for the challenge. The court may not

9

speculate about or consider other possible reasons for the challenge. (*Ibid*.)

If the appellate court determines the objection was improperly denied, the error "shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (§ 231.7, subd. (j).)

Analysis

We must determine de novo whether, in light of the totality of the circumstances, there is a substantial likelihood an objectively reasonable person would view S.M.'s cognizable group membership as a factor in the use of the peremptory challenge. (§ 231.7, subds. (d)(1), (j).) We are limited to the prosecutor's stated reasons for challenging S.M. (*Id*., subds. (c), (j).) The prosecutor offered the following reasons:

(1) The prosecutor preferred prospective jurors in the next group of six.

(2) S.M. seemed less attentive than other prospective jurors, based on eye contact and body language. Other prospective jurors gave the prosecutor more eye contact, whereas S.M. was "kind of looking down." Other prospective jurors seemed more engaged than S.M.

(3) S.M.'s decision to walk back into the courtroom when the rest of the jury had already been excused was indicative of whether he paid close "attention to the process."

(4) S.M.'s "responses were extremely brief"; S.M. "didn't have much of anything to say"; and S.M. "did not have much to say about what [the prosecutor's] questions were."

(5) The prosecutor intended to retain a female Hispanic prospective juror, who ultimately did serve as a trial juror.

(6) The victim in the case is also Hispanic.

We acknowledge the second and third points listed above are presumptively invalid under section 231.7, subdivision (g). That subdivision specifically describes inattentiveness; failing to make eye contact; lack of rapport; and problematic attitude, body language, or demeanor as having been "historically . . . associated with improper discrimination in jury selection." (§ 231.7, subd. (g)(1).) The prosecutor cited S.M.'s inattentiveness, body language, and lack of eye contact. The prosecutor also identified inattentiveness as the significance of S.M. entering the courtroom when the jury had been excused. The prosecutor's claim that S.M. was less "engaged" than other prospective jurors similarly critiqued some combination of S.M.'s demeanor and inattentiveness.

Section 231.7, subdivision (g)(2) prescribes the circumstances under which these presumptively invalid reasons "can be absolved of that presumption." (*People v. Ortiz*, *supra*, 96 Cal.App.5th at p. 793.) The trial court must confirm the "asserted behavior occurred." (§ 231.7, subd. (g)(2).) Here, the trial court did so. However, "[e]ven with that confirmation, the counsel offering the reason *shall* explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (*Ibid.*, italics added; see *Ortiz*, at p. 794 [section 231.7, subdivision (g)(2) contains both " 'confirmation' " and " 'explanation' " requirements].)

We agree with the dissent that one may wonder why behaviors like inattentiveness would require further explanation. And we acknowledge that the prosecutor and trial court could have made a more extensive and thorough inquiry. Nevertheless, we think reversal is unwarranted.

11

As the People point out, both the prosecutor and the trial court noted how different S.M. acted from the other jurors. That he walked back in the courtroom when the other jurors had been excused caught the attention of both the prosecutor and the judge. His response to questions was noticeably different than that of other jurors. In this instance, to attribute his dismissal to a lack of sensitivity to characteristics of his ethnicity could well be insulting to S.M.

S.M.'s lack of attention alone was a sufficient reason for his dismissal. It overcomes the presumption of invalidity under section 231.7, subdivision (g)(2). The peremptory challenge here was unrelated to a conscious or unconscious bias. The prosecution had a legitimate reason to be concerned about S.M.'s ability to be "fair and impartial." (*Id.*, subd. (f).) No matter what a person's background, race, or economic standing, if the juror does not pay attention, the juror does not belong on any jury.

We appreciate the Legislature's concern relating to the problem of bias, whether explicit or implicit. Nevertheless, no capable attorney would fail to challenge such a juror unless the attorney had what is known in the trade as a dead-bang loser.

As I pointed out in my dissent in *People v. Uriostegui* (2024) 101 Cal.App.5th 271, 283, the trial judge's ruling is well supported. It is not necessary for the trial judge to specifically say on the record, " 'I find by clear and convincing evidence the reasons of the prosecutor for the peremptory challenge bear on the prospective juror's ability to be fair and impartial in the case.' " (*Ibid.*)

[[*II. Hearsay Exception*

(a) Spontaneous Statement Exception to Hearsay Rule

SanMiguel contends the trial court abused its discretion when it admitted the evidence regarding Soto's head nod as a spontaneous statement.

Evidence Code section 1240 provides:

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

To be admissible as a spontaneous statement " '(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citation.]" (*People v. Sanchez* (2019) 7 Cal.5th 14, 39.)

All the elements of a spontaneous statement exist here: (1) Soto had just been attacked without warning. He had a deep gash in his head and had been rendered unconscious. Anyone would be in a state of nervous excitement sufficient to render his head nod spontaneous and unreflecting. (2) The head nodding was made while Soto was still lying on the ground recovering from being knocked unconscious. His nervous excitement undoubtedly still dominated, and his reflective powers were still held in abeyance. (3) Soto's head nod directly related to the

13

circumstances of the preceding occurrence. In short, the circumstances here are precisely the circumstances Evidence Code section 1240 was intended to cover.

SanMiguel argues that Zamora was the declarant, not Soto. SanMiguel claims Soto merely responded to Zamora's leading question. But that the statement is in response to a question does not make the statement inadmissible under Evidence Code section 1240. (*People v. Pedroza* (2007) 147 Cal.App.4th 784, 791.)

SanMiguel argues that the circumstances were not sufficiently trustworthy to admit the evidence. He points out that Soto had been generally unresponsive to Zamora's questions, and only responded to that one question, and that the head nod could not be seen on Zamora's body camera video. He also suggests the head nod may not have been a nod, but only movement caused by the paramedics as they were working on Soto.

But Zamora testified Soto nodded his head in response to his question, and that the head nodding was a deliberate act. The factors cited by SanMiguel go to the weight of the evidence, not its admissibility.

(b) Not Testimonial Hearsay

In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 1354] (*Crawford*), the United States Supreme Court considered the relationship between the Sixth Amendment's Confrontation Clause and exceptions to the hearsay rule. The Supreme Court held that testimonial statements of a witness who did not appear at a trial violate the Confrontation Clause unless the witness was unavailable, and the defendant had a prior opportunity for cross-examination. (*Id*. at pp. 53-54.) The *Crawford* rule does not

14

apply to hearsay exceptions that were recognized at the time of the Sixth Amendment's adoption.  (*Id*. at p. 56, fn. 6.)

*Crawford* did not define "testimonial statements."  That definition was provided in *Davis v. Washington* (2006) 547 U.S. 813, 822 [165 L.2d.2d 224], as follows: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

SanMiguel argues the circumstances objectively indicate Zamora's primary purpose in interrogating Soto was to establish past events potentially relevant to later criminal prosecution.  But that is not the case.  Zamora found Soto lying on the ground suffering from severe blunt force trauma.  The perpetrator was at large, and public safety was at risk.  Zamora needed to identify the perpetrator to protect public safety.

This case is very similar to *People v. Pedroza, supra*, 147 Cal.App.4th 784.  In *Pedroza*, the police responded to a call of a house fire.  When they arrived, they found a woman lying on the ground outside the house suffering from severe burns.  The police asked the woman what happened.  She responded that her husband burned her by throwing gas on her.  The woman died of her burns.  Her statement to the police was admitted at husband's trial for murder under the spontaneous statement exception to the hearsay rule.

15

In affirming the trial court, the Court of Appeal determined that the victim's statement was not testimonial hearsay. The officers encountered the victim during an ongoing emergency; the officers' conversations with the victim were brief; the statements were not taken under the calm circumstances of a formal interrogation; and the victim's statement did not purport to describe an event that occurred some time ago. (*People v. Pedroza, supra*, 147 Cal.App.4th at pp. 793-794.) The Court of Appeal also pointed out that it is difficult to identify the circumstances where a spontaneous statement qualifying under Evidence Code section 1240 could be considered testimonial. Such statements by their nature are not made in contemplation of their testimonial use in a future trial. (*Pedroza*, at p. 794.)

SanMiguel's reliance on *People v. Cage* (2007) 40 Cal.4th 965 is misplaced. In *Cage*, a sheriff's deputy was dispatched to defendant's residence on report of a family fight. As the deputy approached the house, he saw a bloody towel and drops of blood. Inside he found defendant picking up broken glass. The glass top of a nearby coffee table was missing. The deputy spoke with the defendant, her mother, and her daughter. The deputy departed, believing no crime had been committed. About an hour later, the deputy was dispatched to an intersection a mile or two away to look for an injured person. The deputy found John, the defendant's son, sitting on the curb. John had a large cut on his face. An ambulance and emergency personnel were already on the scene. The ambulance transported John to the hospital. The deputy did not accompany John but went to the hospital " 'at a later point.' " (*Id*. at p. 971.) When the deputy arrived at the hospital, John was in the emergency room but had not yet been treated. The deputy asked John what happened. John told him

16

he got into an argument with his mother; his mother pushed him, and he fell onto the coffee table, breaking the glass top; his grandmother held him while his mother cut his face with a piece of glass.

In determining that John's statement was testimonial hearsay, our Supreme Court said: "Thus, by the time [the deputy] spoke with John in the hospital, the incident that caused John's injury had been over for more than an hour. The alleged assailant and the alleged victim were geographically separated, John had left the scene of the injury, and he thereafter had been taken to a remote location to receive medical treatment. Though he apparently had not yet been treated by a doctor when Mullin questioned him, he was in no danger of further violence as to which contemporaneous police intervention might be required." (*People v. Cage, supra*, 40 Cal.4th at p. 985.)

Here there are none of the factors that led the Supreme Court in *Cage* to conclude the victim's statement is testimonial hearsay. When Zamora spoke to Soto, the incident had not been over for more than an hour. Zamora did not know the location of the alleged assistant. Soto had not left the scene of the injury. Whether Soto or other members of the public were in danger was unknown to Zamora.

### III. There Was No Ineffective Assistance of Counsel

SanMiguel contends he received ineffective assistance of counsel when his counsel failed to object to the dual use of facts to impose the upper term on count 2.

The trial court sentenced SanMiguel to a total of 11 years to life consisting of: on count 1, attempted murder, seven years to life, plus one year for personal use of a dangerous weapon, plus three years for inflicting great bodily injury; on count 2, assault

17

with a deadly weapon, the upper term of four years, stayed pursuant to Penal Code section 654.

The following factors in aggravation were found true by the jury: SanMiguel personally inflicted great bodily injury; the crime involved great bodily harm and other acts disclosing a high degree of cruelty, viciousness, or callousness; and SanMiguel was armed with and used a weapon.

SanMiguel points out that an enhancement may not be used to impose an upper term unless the court has the power to strike the enhancement and does so. (Cal. Rules of Court, rule 4.420(g).) In addition, a fact that is an element of the crime being punished cannot be used to impose the upper term. (*Id.*, rule 4.420(h).) SanMiguel argues that great bodily injury cannot be used to impose the upper term because it was charged as an enhancement.

SanMiguel claims that the first two factors in aggravation are indistinguishable in that they both involve great bodily harm. But the second factor is distinguishable in that it not only requires great bodily harm, but also other acts involving a high degree of cruelty, viciousness, or callousness. Here SanMiguel's attack on Soto was entirely unprovoked. He hit Soto on the head with a metal bar with enough force to render him unconscious. As Soto was defenseless on the ground and with Marroquin begging him to leave Soto alone, SanMiguel hit Soto again with a baseball bat. Finally, Marroquin placed her body over Soto and continued to beg SanMiguel to leave him alone. SanMiguel hit Soto in the head again next to Marroquin's face. SanMiguel walked away, not caring whether Soto was dead or alive. The jury's finding that the crime involved a very high degree of cruelty, viciousness, or callousness is well supported by the

18

evidence. That the offense was committed with a high degree of cruelty, viciousness, or callousness is not an element of the offense or any enhancement alleged here. Thus imposing the upper term on that basis does not constitute a dual use of facts.

The trial court stated that it chose the upper term on count 2 because of the factors in aggravation found true by the jury. But it only takes a single aggravating factor to impose the upper term. (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1103.) In sentencing SanMiguel, the court said, "This case was far more serious than other case of this type." The court also stated, "I find that [SanMiguel] poses an unreasonable risk of public safety and is likely to offend in the future. This was completely unprovoked and extremely violent attack on somebody. And [SanMiguel] has shown absolutely zero insight or remorse as to why the offense happened."

If the trial court erred, the error was harmless by any standard. There is no reasonable doubt that the court would have imposed the upper term based on the single aggravating factor that the crime was committed with a high degree of cruelty, viciousness, or callousness.

Moreover, in order to prevail on the claim of ineffective assistance of counsel, SanMiguel must demonstrate on appeal that counsel had no valid tactical reason for his action or failure to act. If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, the claim of incompetence must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

19

Here there is a very good reason why counsel would not object.  The trial court sentenced SanMiguel to the four-year upper term for assault with a deadly weapon, but did not impose a term for the great bodily injury enhancement.  The court could have imposed the three-year middle term for the assault, plus a three-year great bodily injury enhancement, for a total of six years instead of four.  Given the trial court's comments at sentencing, counsel was wise to leave well enough alone.

*IV. Dismissal of an Enhancement on Count 1*

SanMiguel contends the trial court erred in refusing to dismiss an enhancement on count 1.

Penal Code section 1385, subdivision (c) provides in part:

"(1) Notwithstanding any other law, the court shall dismiss an enhancement *if it is in the furtherance of justice to do so*, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present.  Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, *unless the court finds that dismissal of the enhancement would endanger public safety*.  'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.

"[¶] . . . [¶]

"(B) Multiple enhancements are alleged in a single case.  *In this instance, all enhancements beyond a single enhancement shall be dismissed*."  (Italics added.)

Here the trial court refused to dismiss an enhancement on count 1, finding that SanMiguel is a danger to public safety. SanMiguel argues the words "shall be dismissed" in Penal Code section 1385, subdivision (c)(2)(B) make dismissal mandatory notwithstanding the finding of dangerousness.

SanMiguel concedes that every appellate court that has considered the matter has rejected his argument. After SanMiguel filed his opening brief, our Supreme Court decided *People v. Walker* (2024) 16 Cal.5th 1024. *Walker* held that the existence of one or more factors listed in Penal Code section 1385, subdivision (c)(2) does not mandate the dismissal of the enhancement. (*Walker*, at p. 1029.)

Instead, our Supreme Court said, "[I]f the court does not find that dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance such that dismissal of the enhancement is not in furtherance of justice.'" (*People v. Walker*, *supra*, 16 Cal.5th at p. 1029, quoting *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1098.) *Walker* makes it clear that dismissal is not mandatory.]]

DISPOSITION

The judgment is affirmed.

<u>CERTIFIED FOR PARTIAL PUBLICATION.</u>

GILBERT, P. J.

I concur:

YEGAN, J.

21

YEGAN, J., Concurring:

I fully concur in the well-written opinion by Presiding Justice Gilbert. But I would go further and declare the methodology of Code of Civil Procedure (C.C.P.) section 231.7, subdivision (j) unconstitutional. (See *People v. Simmons* (2023) 96 Cal.App.5th 323, 340-345 (dis. opn. of Yegan, J.) [automatic reversal aspect of Racial Justice Act (Pen. Code § 745) is unconstitutional because it usurps California Constitution "miscarriage of justice" standard which requires an examination of the entire record before reversal].) Our recent prior appellate opinion in *People v. Uriostegui* (2024) 101 Cal.App.5th 271 (opn. of Baltodano, J., conc. of Cody, J., dis. opn. of Gilbert, P.J.), should be overruled.[1]

---

[1] C.C.P. section 231.7, subdivision (j) provides: "The denial of an objection made under this section shall be reviewed by the appellate court de novo, with the trial court's express factual findings reviewed for substantial evidence. The appellate court shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record. The reviewing court shall consider only reasons actually given under subdivision (c) and shall not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court. Should the appellate court determine that the objection was erroneously denied, that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial."

Our California Supreme Court has said that dismissal of a potential juror for racial bias is "structural error." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157-1158.) We are bound by

The legislative attack upon the California Constitution and the separation of power theory of government continues. This time, the Legislature dictates, in the context of empaneling a criminal jury trial, that the dismissal of a juror for perceived racial basis, is to be viewed wearing "horse blinders." The "micromanagement" of C.C.P. section 231.7, subdivision (j) violates separation of powers jurisprudence. It is akin to statute telling a plumber how much torque is required when using a pipe wrench.

The time-honored appellate rule is that a reviewing court indulges in all reasonable inferences to uphold any ruling on appeal. (E.g., 9 Witkin, Cal. Procedure, (6th ed. 2021) §§ 385-387, pp. 420-424.) There has never been a requirement that the exact reason given by the trial court for its order precludes the appellate court from using its own judgment in reviewing the propriety of the order under review. We review the ruling of the trial court, not its rationale. (E.g., *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329-330; *Yarrow v. State of California* (1960) 53 Cal.2d 427, 438; *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981.) Even an unsound course of reasoning is not fatal to a trial court order. (*People v. Gibson* (1987) 195 Cal.App.3d 841, 853; *People v. Patton* (1976) 63 Cal.App.3d 211, 219.) If this statute passes constitutional muster, over a hundred years of Supreme Court precedent has been "overruled."

Recently, the California Supreme Court, albeit in another context reminded everyone that the "'term "constitution" implies an instrument of a permanent and abiding nature . . . .'"

---

this holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) In the last sentence of the statute, the Legislature has codified the rule.

2

(*Legislature of the State of California v. Weber* (2024) 16 Cal.5th 237, 256.)  I am in complete agreement.  The California Constitution expressly requires that an appellate court affirm a judgment unless, the court determines there has been a miscarriage of justice.[2]  The Legislature cannot, and should not, mandate a "form over substance" appellate rule purporting to put a California appellate court in a "straight jacket."  The judiciary cannot force the executive branch of government to charge someone with having committed a crime.  The judiciary cannot force the legislative branch of government to enact or refrain from enacting a statute relating to the definition of crime or punishment.  And, these two branches of government cannot tell judges how to judge.  These are basic "separation of powers" observations which have stood the test of time.  They should not be abandoned.

I applaud legislative efforts to combat the perception of racial bias it sees in our judicial system.  But the Legislature may not enact laws which violate our state constitution.  Here, the Legislature has again stepped over the line.  Unless, and until, the California Supreme Court directs otherwise, I will continue to object to any legislative attempt to "overrule" our California Constitution.  As Justice Musmanno says in his famous

---

[2] California Constitution, article VI, section 13 provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, *the court* shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (*Ibid.*, italics added.)

dissenting opinion, "I shall continue to dissent . . . until the cows come home." (*Bosley v. Andrews* (1958) 393 Pa. 161, 195, overruled on another ground in *Niederman v. Brodsky* (1970) 436 Pa. 401, 413.)

CERTIFIED FOR PUBLICATION.


YEGAN, J.

CODY, J., Concurring and Dissenting:

I concur in the majority opinion except for its affirmance of the judgment and Part I of the Discussion section, from which I respectfully dissent. The prosecution challenged a prospective juror for reasons that were legally invalid, unsupported by the record, or otherwise unpersuasive. In light of the totality of the circumstances, there was a substantial likelihood an objectively reasonable person would view cognizable group membership as a factor in the peremptory challenge. The trial court nevertheless denied appellant's motion under Code of Civil Procedure section 231.7.[1] This was error. The Legislature has determined such error is prejudicial.[2] I would reverse and remand for a new trial.

For ease of reference, I repeat the reasons the prosecutor offered to justify striking S.M.:

(1) The prosecutor preferred prospective jurors in the next group of six.

(2) S.M. seemed less attentive than other prospective jurors, based on eye contact and body language. Other prospective jurors gave the prosecutor more eye contact whereas S.M. was "kind of looking down." Other prospective jurors seemed more engaged than S.M. did.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

[2] I respectfully depart from Justice Yegan's view that the methodology of section 231.7, subdivision (j) is unconstitutional. "Because the state constitution does not limit the Legislature's power to define a miscarriage of justice, we must conclude it has properly exercised its authority to do so here." (*People v. Simmons* (2023) 96 Cal.App.5th 323, 339.)

(3)  S.M.'s decision to walk back into the courtroom when the rest of the jury had already been excused.  This behavior was indicative of whether S.M. paid close "attention to the process."

(4)  S.M.'s "responses were extremely brief"; S.M. "didn't have much of anything to say"; and S.M. "did not have much to say about what [the prosecutor's] questions were."

(5)  The prosecutor intended to retain a female Hispanic prospective juror, who ultimately did serve as a trial juror.

(6)  The victim in the case is also Hispanic.

I agree with the majority that the reasons outlined in the second and third points listed above are presumptively invalid under section 231.7, subdivision (g).  I also agree the trial court confirmed the "asserted behavior occurred."  (§ 231.7, subd. (g)(2).)

I disagree, however, with the majority's conclusion that the presumption of invalidity was overcome.  (Maj. opn. *ante*, at p. 12.)  The prosecutor never explained why S.M.'s behavior "matter[ed] to the case to be tried."  (§ 231.7, subd. (g)(2).)  Section 231.7 subdivision (g)(2) expressly requires such an explanation to rehabilitate a presumptively invalid reason.

As recently articulated in *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 890-891:  "[T]he only way to rebut the presumption of invalidity is by applying the statutorily prescribed two-step process of (1) confirmation of the behavior by the trial court, and (2) explanation by counsel of why the behavior matters to the case.  If the presumption of invalidity for a particular reason identified by counsel is not rebutted through the two-step procedure set forth in subdivision (g)(2) of section 231.7, that reason must be treated as *conclusively* invalid.  In other words, the trial court must treat *as conclusive* the

2

presumption that the reason identified by counsel was actually based on 'race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation,' or perceived membership in any such group, as prohibited by section 231.7, subdivision (a)."

Because the prosecutor failed to explain why S.M.'s behavior mattered in this case, I must treat as conclusive the presumption that he was excused for invalid, discriminatory reasons.

One may well wonder why behaviors like inattentiveness would require further explanation. Our function, however, is not to evaluate the wisdom of the Legislature's choices. Rather, "'"our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose."'" (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.) We are not at liberty to delete the unambiguous explanation requirement. (See, e.g., *Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 822 ["'"Appellate courts may not rewrite unambiguous statutes"'"].) To the extent any ambiguity exists, the Legislature recorded its intent "that this act be broadly construed to further the purpose of eliminating the use of group stereotypes and discrimination, whether based on conscious or unconscious bias, in the exercise of peremptory challenges." (Stats. 2020, ch. 318, § 1, subd. (c).) I believe my interpretation is consonant with this capacious intent.

The prosecutor's remaining reasons for challenging S.M. are unsupported by the record or are otherwise unpersuasive. The prosecutor's unelaborated preference for other prospective jurors over S.M. lacks explanatory value. Implicit in every rational peremptory challenge is a belief that other prospective jurors would be more favorable in some respect. Simply making

that universal assumption explicit does not explain the prosecutor's decision in this instance.

The brevity of S.M.'s responses is an unconvincing rationale. The record shows not all S.M.'s responses were brief. S.M. offered an 85-word reply to one of the several questions counsel posed specifically to him. S.M.'s responses to counsels' other questions were only one or two sentences each, but he did not offer, for example, one-word or two-word answers. The court's voir dire largely sought basic biographical information inconducive to lengthy reply.

Even granting S.M.'s answers were brief, however, it is unclear why brief answers made S.M. an undesirable juror. To the extent they indicated his lack of attention or a problematic demeanor, this rationale is invalid under section 231.7, subdivision (g), for the reasons discussed above.

Moreover, the prosecutor engaged in "cursory questioning" of S.M. and did not question him about the concerns of inattentiveness or disinterest—circumstances the statute invites courts to consider. (§ 231.7, subd. (d)(3)(C)(i), (ii).) The prosecutor directed a single question to S.M. specifically. The prosecutor asked whether S.M. would require the victim to testify to reach a decision. S.M. responded: "I don't think I would require him to speak specifically." This response addressed the prosecutor's question. The prosecutor made no other effort to probe S.M. specifically on this or any other topic. A party cannot pose a single, straightforward question to a prospective juror and then defeat a section 231.7 objection by claiming the juror's responses were "very brief" and the juror "did not have much to say" about the party's questions. Otherwise, relying on many prospective jurors' unwillingness to answer questions posed to

4

the group, a party could remove members of cognizable classes with impunity simply by questioning them cursorily.

The prosecutor's final two reasons—the presence of a Hispanic juror he did not challenge and the victim also being Hispanic—did not attempt to explain why he removed S.M. That the prosecutor *did not* challenge a female Hispanic juror does not explain why he *did* challenge S.M. Nor does the victim's race or ethnicity explain why S.M. was an undesirable juror from the prosecutor's perspective. Instead, the prosecutor offered these two justifications to refute a claim of bias under section 231.7.

Neither does so. A party need not remove all prospective jurors of a cognizable group for a section 231.7 objection to succeed. The statute does not support this type of binary, all-or-nothing thinking. Furthermore, while the victim in the case is Hispanic, appellant is as well. Section 231.7 identifies the shared group membership between appellant and S.M. as a circumstance the court may consider. (See § 231.7, subd. (d)(3)(A)(i).)

The prosecutor's reliance on unsupported or unpersuasive reasons increases the likelihood S.M.'s cognizable group membership factored into the challenge, especially from the perspective of an objectively reasonable person who "is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors" in California. (*Id*., subd. (d)(2)(A).) Moreover, even if some of the prosecutor's reasons were supported by the record or were otherwise appropriate, the presence of conclusively invalid reasons required the court to sustain the objection under section 231.7. (§ 231.7, subd. (d); *Caparrotta, supra*, 103 Cal.App.5th at p. 896 ["[T]he Legislature did not intend to allow a peremptory challenge to be exercised, even in part, for an invalid reason"].)

5

I believe that, in light of the totality of the circumstances, there is a substantial likelihood an objectively reasonable person would view S.M.'s cognizable group membership as a factor in the peremptory challenge. (§ 231.7, subd. (d)(1).) Under section 231.7, the error is prejudicial, and reversal and remand for a new trial is required. (*Id*., subd. (j).)

In reaching my conclusion, "[I] need not, and do not, determine whether the prosecutor was motivated by bias. (*People v. Uriostegui* (2024) 101 Cal.App.5th 271, 281.) The statute's contemplation of both implicit and explicit bias obviates this inquiry. I also do not attribute the prosecutor's challenge or court's ruling "to a lack of sensitivity to characteristics of [S.M.'s] ethnicity . . . ." (Maj. opn. *ante*, at p. 12.) The statute addresses reasons historically associated with improper discrimination in jury selection. Neither the statute nor I endorse the belief that those reasons, in fact, accurately describe any group.

I expect that counsel challenging prospective jurors will avail themselves of section 231.7's framework to address potential implicit biases. The explanation requirement, for example, forces attorneys to articulate a connection between certain historically discriminatory reasons for a peremptory challenge and the current case. (§ 231.7, subd. (g)(2).) An attorney's inability to do so increases the risk that bias factored into the challenge. Here, the prosecutor simply failed to offer the requisite explanation. I would reverse and remand for a new trial.

<u>CERTIFIED FOR PUBLICATION</u>

CODY, J.

6

Ryan J. Wright, Judge

Superior Court County of Ventura

_____

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.